UNITED STATES, Appellee,

v.

Tallie E. HOLT, Jr., Sergeant First Class, U.S. Army, Appellant.

No. 65,882.
CM 8800780.

U.S. Court of Military Appeals.

Argued July 9, 1991.

Decided Sept. 30, 1991.

For Appellant: *Herbert S. Moncier, Esq.* and *Ann C. Short, Esq.* (argued); *Captain James Kevin Lovejoy* and *Captain Michael P. Moran* (on brief).

For Appellee: *Captain Marcus A. Brinks* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Major Maria C. Fernandez* (on brief); *Major Thomas E. Booth* and *Captain Mark E. Frye.*

*Opinion of the Court*

EVERETT, Senior Judge:

A general court-martial composed of officer and enlisted members convicted appellant, over his pleas, of one specification each of sodomy and committing indecent acts with his minor stepdaughter, *see* Arts. 125 and 134, Uniform Code of Military Justice, 10 USC §§ 925 and 934, respectively, and sentenced him to a dishonorable discharge, confinement for 15 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review affirmed. 31 MJ 758 (1990).

Appellant[1] filed a petition for reconsideration and a suggestion for reconsideration *en banc* with the Court of Military Review, but the court denied both.

On appellant's petition, this Court granted review of eight complaints of trial error. 33 MJ 156 (1991). After full consideration of all eight, we conclude that only the last has merit. We will address all eight, seriatim.

**I**

The specifications of which appellant was convicted allege that he

did at Fort Polk, Louisiana and Heidelberg, Federal Republic of Germany, *on divers occasions*, between 20 November 1984 and 3 September 1986, commit sodomy with Aree–Rut Wanawak, a child under the age of sixteen years

and that he

did at Heidelberg, Federal Republic of Germany, *on divers occasions*, between 20 November 1985 and 3 September 1986, commit indecent acts upon the body of Aree–Rut Wanawak, a female under sixteen years of age, not the wife of the said [accused], by touching her on the breasts and vaginal area with the intent to gratify the sexual desires of the said [accused].

Also, in his opening statement to the members, trial counsel accurately predicted that the evidence would show multiple instances of misdeeds. In fact, in her subsequent testimony, Patti (as the complainant was known) related two fondling incidents in Nuernberg, one act of fondling and a single anal sodomy at Fort Polk, two incidents of fondling in Tennessee, and two additional fondlings and one oral sodomy in Heidelberg.

Given this state of the evidence and considering the wording of the specifications, appellant complains: "At no time was the Government ever required to elect which of the several incidents under each Charge was being sought for a conviction, nor were the court members ever instructed

that at least two-thirds of the members must unanimously agree *beyond a reasonable doubt* that SFC Holt committed the same specific criminal act under each Charge." Appellant cites *United States v. Vidal*, 23 MJ 319 (CMA), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987), in support of his assertion that the military judge erred by failing to require, *sua sponte*, that the Government at the close of its case-in-chief "elect the particular incident of alleged sodomy and the particular incident of committing an indecent act upon which a verdict of guilty would be sought." Specifically, appellant has cited us to the following language in *Vidal:*

We recognize that usually where several similar but separate offenses are involved, the judge should require the prosecution to elect which offense is being prosecuted. Otherwise, an accused may have difficulty in preparing his defense; may be exposed to double jeopardy; and may be deprived of his right to jury concurrence concerning his commission of the crime. However, an election has not been required where offenses are so closely connected in time as to constitute a single transaction.

*Id.* at 325 (citations omitted).

Under the circumstances of this case, however, *Vidal* does not support appellant's conclusion of reversible error.

**A**

Two distinct and unrelated acts of sodomy were reflected by the evidence: an anal act at Fort Polk and an oral act in Heidelberg, Germany, many months apart. Holt vigorously contested both. The defense presented evidence that he could not have committed the anal sodomy at Fort Polk because he was at the hospital with his wife at the time Patti claimed that the act had occurred; additionally, appellant presented expert medical testimony that, first, challenged the medical evidence offered by the prosecution regarding scarring in Patti's rectal area and that, second,

---

**1.** The denial order erroneously reflects that the Government filed this petition.

revealed that Patti herself had denied to a witness that the incident ever had occurred.

Concerning the oral sodomy, other children in the family, who purportedly were present in the same room and watching television, testified that they never had seen any indication of any sexual involvement between appellant and Patti and that appellant had never made any sexual overture to them. Additionally, appellant offered evidence of motive for Patti to lie as to all of the incidents.

Under these circumstances, appellant reasonably argues:

> Some court members may have doubted the testimony about the oral sodomy, concluding it was implausible that the other children in the room would not have noticed and heard something or concluding it was unlikely SFC Holt committed this act in the presence of witnesses. Other court members may have believed Dr. Braeunig's medical testimony [that Patti's anal area was not scarred from sodomy, as the prosecution had claimed] and SFC Holt's lack of opportunity defense to the alleged act of anal sodomy.

■ The flaw in appellant's claim of prejudice, however, is that he actually got the *benefit* of an erroneous instruction that, to convict him of the sodomy specification, at least five of the members must conclude beyond a reasonable doubt that *both* acts had occurred. Specifically, the military judge instructed the members that the first element of the sodomy charge was "that *at Fort Polk and Heidelberg,* Federal Republic of Germany, on divers occasions between 20 November 1984 and 3

September 1986, the accused ... engaged in unnatural carnal copulation with [Patti] by placing his penis in the mouth or anus of" Patti.[2]

In other words, the members were told that they could find Holt guilty of sodomy only if they were convinced beyond a reasonable doubt that he had committed both the act at Fort Polk and the act in Heidelberg. By contrast, if the prosecution had been forced to elect which incident on which to go to the members or if the military judge had instructed the members that two-thirds of them had to agree as to which alleged sodomy had occurred,[3] appellant could have been convicted if only one of the acts had been satisfactorily made out.

Under these circumstances, Holt has no legitimate complaint that he may have been prejudiced by the lack of a consensus among the members: Not only was consensus required by the instruction set out above, but also it was required as to *both* alleged acts in order to convict. We presume the members followed the instructions in the absence of any indication to the contrary. *See United States v. Ricketts,* 1 MJ 78, 82 (CMA 1975). Moreover, the court-martial found Holt guilty as charged without exceptions or substitutions to delete one location or the other. Thus, we can only infer that the requisite number of court members found him guilty of both acts pursuant to the judge's instructions.

Appellant reminds us that in *Vidal* the Court expressed other concerns, apart from assuring a consensus of the members, to

---

**2.** Appellant quarrels with the disjunctive "or" between "mouth" and "anus" and argues that this presented yet another opportunity for lack of sufficient focus of the members on a specific act of sodomy. However, inasmuch as only *one* act is claimed to have occurred at each location and inasmuch as there was no contest as to the nature of each alleged act, the evidence did not offer any opportunity at all for confusion among the members.

**3.** The Government has asked this Court to hold that, as an alternative to *Vidal*'s election rule, a military judge may instruct the members of a requirement that they must concur as to any

finding that the accused committed a particular act. Pointing out that several civilian courts have adopted such an approach, the Government argues that this would appropriately balance the interests of the accused (by obviating the need to charge each act separately, *see United States v. Vidal,* 23 MJ 319, 325–26 (CMA 1987)), and the practical needs of the Government in proving child-abuse cases. *See State v. Petrich,* 101 Wash.2d 566, 683 P.2d 173, 178 (1984); *Covington v. State,* 703 P.2d 436, 440–41, *on rehearing,* 711 P.2d 1183 (Alaska App.1985). Under the circumstances of this case, we need not decide finally on this suggestion.

justify our election requirement. Neither is of any moment here. Appellant makes no persuasive case that the claimed error caused him any difficulty in preparing his defense; in fact, as summarized earlier, his defense pointedly addressed both alleged acts. Moreover, since the specification included both acts, the prosecution's evidence showed both acts, the instruction required a finding as to both acts, and the finding of guilty was made without any exceptions or substitutions, there is no possibility that the error might subject appellant to double jeopardy. *See Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (Double Jeopardy Clause prevents subsequent prosecution for a crime if establishing an essential element of that crime requires proof of conduct of which the accused already has been convicted.).

**B**

■ As to the indecent-acts specification, we also hold that *Vidal* did not require an election. The specification alleged acts "on divers occasions" within a certain time frame in Heidelberg. The evidence indicates only two such acts in Heidelberg and that they were committed at the same place and, at most, only hours apart. "[A]n election has not been required where [similar] offenses are so closely connected in time as

to constitute a single transaction."[4] 23 MJ at 325.

**II**

■ Although not raised by anyone at trial, appellant claims, as he did in the Court of Military Review, that his convictions were barred by the applicable statute of limitations. We are satisfied, however, that the running of the statute was timely tolled.

As correctly concluded by the Court of Military Review, "the Government had until 20 November 1987 to toll the statute of limitations for the earliest of the offenses alleged."[5] 31 MJ at 760. The statute is tolled by "receipt of sworn charges and specifications by an officer exercising summary court-martial jurisdiction over the command." Art. 43(b), UCMJ, 10 USC § 843(b) (1956). *See* n. 5, *supra*. Thus, the fundamental question is: When did the summary court-martial authority receive these charges?

In fairness to appellant's claim, we must acknowledge a certain amount of confusion as to the answer to this question. As the staff judge advocate first noted in his post-trial recommendation to the convening authority, "[t]he charge sheet ... incorrectly lists HQ, USAE, CENTAG ... as the ... summary court-martial jurisdiction" when,

---

4. As we acknowledged earlier, there was evidence of other indecent acts, but all of them occurred at other places and outside the alleged time frame. Moreover, the military judge instructed the members that such evidence could be considered only "for the limited purpose of its tendency, if any, to prove a plan or design, or course of conduct of the accused to commit sodomy or indecents acts on" Patti. Also, the defense gave the members a chronology of appellant's duty assignments that indicated that his tours of duty at Fort Polk, Nuernberg, and Tennessee were not within the time period in which the charged indecent acts allegedly had occurred. Finally, the military judge expressly instructed the members that, to convict on this specification, they had to find that the acts had occurred "at Heidelberg, Germany." Under these circumstances, there is no risk that appellant's conviction of the indecent-acts specification was founded on indecent acts outside the alleged time frame and at a location other than the one alleged.

5. The statute of limitations for both sodomy and indecent acts presently is 5 years. Art. 43(b)(1), Uniform Code of Military Justice, 10 USC § 843(b)(1), as amended by Pub.L. No. 99–661, div. A, Title VIII, § 805(a), (b), 100 Stat. 3908 (1986). Prior to November 14, 1986, however, the statute of limitations applicable to sodomy was 3 years and that applicable to committing indecent acts with a child was 2 years. Art. 43(b) and (c) (1982). Since the earliest date in the time period alleged for the sodomies was November 20, 1984, and the earliest date alleged for the indecent acts was November 20, 1985, the statute must have been tolled not later than November 20, 1987, for any such acts to be triable by court-martial. In light of our disposition of this issue, we need not address what the evidence reflects concerning the specific dates within the alleged time period on which the acts occurred. *See generally United States v. Moore*, 32 MJ 170 (CMA 1991).

instead, the next higher command—HQ, 26th Support Group—actually exercised such jurisdiction over appellant. While it is irrefutable that Major Kettleson, as adjutant for the former command, received the charges at 1300 hours on November 18, 1987, the endorsement forwarding those charges to the latter command and recommending trial by general court-martial is undated. *See generally* RCM 403(a), Manual for Courts–Martial, United States, 1984 ("Immediately upon receipt of sworn charges, an officer exercising summary court-martial jurisdiction over the command shall cause the hour and date of receipt to be entered on the charge sheet."); RCM 403(a), Discussion ("The entry indicating receipt is important because it stops the running of the statute of limitations.").

Other documents, however, do shed some light on this facial uncertainty. When the 26th Support Group did receive the charges, that command further endorsed them by appointing an Article 32 investigating officer. This endorsement was signed for the commander by Major Kettleson, the command's adjutant—the same officer who earlier had signed as the adjutant for HQ, USAE CENTAG. The Court of Military Review found that it "was not unusual or improper" for the same officer to serve as adjutant for both commands. 31 MJ at 761.

Since the same officer received the charges for HQ, USAE, CENTAG, and also signed the appointment of the Article 32, UCMJ, 10 USC § 832, investigating officer on behalf of the Commander of the 26th Support Group, it reasonably may be inferred here that the two commands were in very close physical proximity. Accordingly, it certainly would not be unusual for this paperwork to be done in a very short time frame.

It might be argued—and, indeed, appellant does assert—that these inferences are not solidly based in the record. One additional factor, however, lends significant credence to these inferences. As the staff judge advocate also recognized, a chronology that the Article 32 officer attached to his report of investigation indicates that, on November 17, 1987, he was "[n]otified of [his] appointment as Investigating Officer" and had "received [his] briefing from ... [the] Attorney Advisor" that the command had furnished him. This surely tends to indicate that the charges were received by the 26th Support Group—the command that appointed the investigating officer, *see* RCM 403(b)(5)—prior to November 20, the date that the statute of limitations would have run. Appellant contends that this notation does not tell *who* "notified" the investigating officer of his appointment; but, since the 26th Support Group appointed him, regularity certainly suggests that someone acting on that command's behalf did the notifying.

Moreover, the chronology reflects a good deal of activity by the investigating officer over the next several days in an effort to move his hearing along. For instance, on November 18 he tried to reach appellant's civilian defense counsel but learned that counsel would not be available for the hearing until December 22; and on November 25 he signed a Letter of Notification to Holt advising him of the date of the hearings. None of this would have regularly occurred if the 26th Support Group had not received the charges formally until near mid-December, as appellant implies was the case.

Certainly, this case is not a paragon of performance of these important responsibilities. Nonetheless, we conclude that the record does support the factual finding by the Court of Military Review that the charges were received by the summary court-martial authority, the 26th Support Group, on November 18, 1987—2 days before the statute of limitations would have run—so we will not disturb that finding. Accordingly, we reject appellant's contention that the statute of limitations barred his trial on the specifications in issue.[6]

---

6. In this same issue, appellant also claimed that the evidence was insufficient as a matter of law

to support the conviction under either specification. Much of this argument evaporates with

## III

During the trial, two expert witnesses testified on behalf of the prosecution. One addressed himself to his diagnosis of Patti, the characteristics of sex abusers in general, and behavioral patterns of sexually abused children. The other testified regarding behavioral characteristics of sexually abused children, too, as well as the statistical occurrence of child abuse in the general population.[7]

■ Defense counsel objected neither to the witnesses' qualifications as experts nor to the substance of their testimony that appellant now contests on appeal. In the absence of plain error, *see* Mil.R.Evid. 103(d), Manual, *supra*, appellant's failure timely to object to the testimony at trial waives his appellate complaint. Mil.R. Evid. 103(a)(1).

This Court will recognize plain error only if the error is both obvious and substantial and had an unfair prejudicial impact on the members' deliberations. *United States v. Fisher*, 21 MJ 327 (CMA 1986). That standard is not satisfied in this case.[8] Accordingly, appellant's failure to object to the challenged testimony is fatal to his appeal.

## IV

■ A similar fate must befall appellant's complaint, first raised on appeal, that certain witnesses erroneously were permitted to recite hearsay statements of Patti that did not constitute either excited utterances, *see* Mil.R.Evid. 803(2), or statements made for medical diagnosis or treatment, *see* Mil.R.Evid. 803(4). Unless properly construed as an exception to the general rule, hearsay is inadmissible, *see* Mil.R. Evid. 802; but it is not incompetent, *see* Drafters' Analysis to Mil.R.Evid. 802, Manual, *supra* at A22–48 (Change 2). In the absence of plain error, which we do not find in this case, *see United States v. Fisher, supra*, appellant's failure to object to the testimony at trial waived the matter as a ground for appeal. Mil.R.Evid. 103(a)(1).

## V

■ Next, appellant asks whether it was "prejudicial error to admit extrinsic offense evidence of prior physical abuse of the alleged victim and the battered child syndrome, the probative value of which was not established and which was unduly prejudicial, confusing, and misleading." *See* Mil.R.Evid. 403. Once again, however, most of appellant's complaints in this Court relate to evidence to which he entered no objection at trial; and so waiver applies. Mil.R.Evid. 103(a)(1). Moreover, the record reasonably implies that his defense counsel affirmatively used much of the challenged evidence as a sword to prove appellant's theory of Patti's motive to lie. Under these circumstances, we are unable to find plain error that would forgive the failure to object.

As to the single bit of evidence to which appellant did object and to which he now renews his objection, we are not persuaded that the rebuttal testimony in question offered any risk of prejudice in light of the record as a whole—even assuming that it was inadmissible.

our disposition of his complaint regarding the statute of limitations. As to any remaining vestige of his argument on the sufficiency of the evidence, we conclude that there was sufficient evidence of record upon which rational factfinders could conclude appellant's guilt of both specifications beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**7.** In *United States v. Ferrer*, 33 MJ 96 (CMA 1991), citing *United States v. Bartoletti*, 32 MJ 419 (CMA 1991), we concluded that a social worker's testimony during sentencing proceedings as to the frequency of child-abuse cases in her county was erroneously admitted over defense objection.

**8.** *See United States v. Garcia*, 25 MJ 159 (CMA 1987), where we stated:

[W]e hold that admission of testimony that appellant's psychological profile was consistent with that of persons who sexually abuse children was error. *See United States v. August*, 21 MJ 363, 365 (CMA 1986). However, appellant did not object to that action, and we find that action was not plain error. *United States v. Young*, 470 U.S. 1 [105 S.Ct. 1038, 84 L.Ed.2d 1] ... (1985); *United States v. Fisher*, 21 MJ 327, 328 (CMA 1986).

## VI

Appellant next protests two portions of testimony that he contends improperly asked for opinions as to the veracity of other witnesses.

### A

First, appellant asserts that he, himself, was subjected to improper cross-examination when trial counsel asked him if Dr. Parker's testimony that he found a scar in Patti's anal area was a lie and when the prosecutor asked whether appellant would rather believe Dr. Braeunig—who detected no such scarring—and not Dr. Parker. Additionally, appellant contends that he improperly was asked on cross-examination whether he thought Dr. Parker was biased and not telling the truth. He bases his assertion of error on Mil.R.Evid. 602, urging that he lacked personal knowledge upon which to answer the questions, and on Mil.R.Evid. 608(a), arguing that another witness' credibility may be attacked by opinion but that this opinion must be limited "to *character* for truthfulness or untruthfulness." (Emphasis added.)

At the outset, we note that, in some instances, appellant seems to have opened the door himself to the complained-of cross-examination. For instance, *prior* to one occasion when trial counsel asked Holt whether he believed that Dr. Parker was biased and not telling the truth, appellant had volunteered that he "did not trust Colonel Parker." When asked why, he responded, "How come I don't trust him? I saw what he did to one of my soldier's family."

We note, also, that defense counsel employed the same technique on appellant's behalf. Four times, counsel asked Patti whether another witness would be lying if that witness disputed her testimony. While this is not determinative of appellant's complaints regarding trial counsel's questioning, it does illustrate the flavor of this contest which, fundamentally, evolved into one of credibility between appellant and Patti. Asking either one whether other witnesses would be lying if they dis-puted the party's testimony is, under such circumstances, virtually rhetorical and amounts to no more than framing the central question that later will be put to the members for decision: Whom do you believe? While better left to closing argument, most often it will not be prejudicial—and it was not here.

■ In any event, defense counsel objected to none of the questions asked of appellant on cross-examination to which he now takes umbrage. Accordingly, the matter was waived. Mil.R.Evid. 103(a)(1).

### B

Second, Holt complains about certain rebuttal testimony of an investigating agent, Special Agent Lauer. After appellant's other two children had testified that they never had seen sexual activity between appellant and Patti, Lauer was called to address his earlier interviews of the two children in which they had made similar statements.

Initially, Lauer testified that he had interviewed Tallie, Jr., and that, when he had asked the child questions, the boy had answered them "immediately." Trial counsel queried, "How did this strike you?" Defense counsel objected, and the military judge sustained the objection; accordingly, the question was not answered.

■ Later, though, Lauer testifed about his interview of Annie, and he revealed that she, too, had answered immediately to his questions. When trial counsel asked, "What if anything was unusual about your interview with Annie?", Lauer responded: "Well, sir, after interviewing the two children, and getting the immediate responses that I got, it was my personal opinion that the children were coached."

Almost immediately after this statement, and in obvious reference to it, the following colloquy occurred:

IC: Your Honor, I would object to . . .

MJ: Objection sustained. The jury will disregard.

IC: And he's been here, the counsel's been advised of that. The CID [Criminal Investigation Command] agent is a professional witness. He knows better. Fine.

MJ: Objection sustained. The jury will disregard.

██ In the absence of evidence to the contrary, the members are presumed to follow the military judge's instructions. *United States v. Ricketts, supra.* Defense counsel correctly entered timely objections, *see* Mil.R.Evid. 608(a) and 701; one was sustained before an answer was given, and the other was honored with an instruction to the members to disregard the answer. Accordingly, no prejudice enured to appellant from this questioning.

## VII

██ Appellant contends—again for the first time on appeal—that certain victim-impact testimony from Patti and from another witness during sentencing proceedings was "highly inflammatory and prejudicially improper." As to most of the testimony in question, we disagree on the merits; and, in any event, appellant's failure to object to any of it waived his right to appellate review of its admissibility. Mil.R.Evid. 103(a)(1).

██ Throughout her pre-findings testimony, Patti never expressed her feelings about what had happened to her or what impact appellant's acts had had on her. Even during the sentencing proceedings, she did not squarely address this topic and said only that she felt sorry for her sisters.

Then, trial counsel asked Patti what she wanted from Holt. She answered that she wanted "him to admit what he has done" to her and "to apologize" to her for it: "I would feel much better."

In earlier testimony, Ms. Tate, the Family Advocacy Program Manager for the 26th Support Group and the Heidelberg Community, expanded somewhat on Patti's testimony. She addressed generally the impor-

tance to victims of having perpetrators acknowledge their acts and their guilt. When asked specifically about the importance to Patti, she answered: "You know, I know that it's ... that Patty says it's important to her, so I ... I know that it is. I do have ... I believe that there's some difference in that there's been so much emotional estrangement from that family anyway...."

██ An accused's recalcitrance in refusing to admit his guilt after findings is, in a proper case, an appropriate factor for the members to consider in their sentencing deliberation on his rehabilitation potential. *United States v. Warren,* 13 MJ 278 (CMA 1982); *see* RCM 1001(b)(5). Indeed, trial counsel argued and the military judge instructed on appropriate consideration of this factor.

Given a proper foundation so that its relevance is clear, testimony like Patti's may simply reflect another logical consideration that the sentencing authority may give to such mendacity of an accused. Just as steadfastness in denying guilt might reflect on the accused's rehabilitation potential, it might also have special impact on the victim. Accordingly, where a proper foundation is laid, such testimony is appropriate for the members' consideration, just as is other relevant evidence of the impact on the victim of the accused's crime.[9] *See United States v. Hammond,* 17 MJ 218 (CMA 1984); *United States v. Marshall,* 14 MJ 157 (CMA 1982); RCM 1001(b)(4) and its Discussion.

Trial counsel's presentation of such evidence here was something less than skillful; on the other hand, it was not presented in a manner that offered any reasonable likelihood of prejudicing Holt in any improper way. In essence, the message sent to the members was that some victims of crimes like this are aided in their rehabilitation if their victimizers own up and apologize for their deeds; that Patti was such a

---

**9.** Under circumstances like those in this case, we consider appellant's refusal to acknowledge his crime to be sufficiently intertwined with the crime itself as to allow admissibility under RCM 1001(b)(4).

victim; and that appellant's refusal to admit his misconduct, even in the face of guilty findings, had added adverse impact on his victim beyond the acts themselves. This message was logical; it was appropriate under RCM 1001(b)(4); and "its probative value" was not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members," *see* Mil.R.Evid. 403.

At any rate, to whatever extent the presentation here of such evidence might have been objectionable, the fact is that it evoked no objection from the defense. Inasmuch as its reception certainly was not plain error in light of our preceding discussion, Holt has waived any appellate complaint. Mil.R.Evid. 103(a)(1).

■ As to other testimony of Ms. Tate of which appellant very briefly complains for the first time on appeal—testimony that generally addressed other aspects of victim impact, such as the likelihood of emotional harm and the need for continuing therapy—the evidence was admissible, *see United States v. Hammond* and *United States v. Marshall*, both *supra;* and, in any event, appellate consideration of the matter was waived, *see* Mil.R.Evid. 103(a)(1).

### VIII

Finally, appellant attacks the competence of the pretrial, trial, and post-trial representation afforded him by his civilian defense counsel, Mr. Edward Bellen. In this connection, he contends that Bellen's services fell "below the level of performance required by the Sixth Amendment, thereby depriving SFC Holt of his constitutional right to effective assistance of counsel." Regrettably, to some extent, we must agree.

■ "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v.*

*Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "A criminal defendant who obtains relief under *Strickland* does not receive a windfall; on the contrary, reversal of such a defendant's conviction is necessary to ensure a fair and just result." *Kimmelman v. Morrison,* 477 U.S. 365, 393, 106 S.Ct. 2574, 2592, 91 L.Ed.2d 305 (1986) (Powell, J., concurring in the judgment).

■ To satisfy *Strickland*'s standard for ineffectiveness, two elements must be shown by an appellant:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S.Ct. at 2064. *Accord United States v. Scott,* 24 MJ 186 (CMA 1987). Concerning the second component, prejudice, the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

Clearly, the Sixth Amendment test for ineffectiveness is quite difficult to meet. Indeed, that is as it should be, for the concern is not to provide a windfall but, rather, to ensure that the result of the trial is reliable by, in turn, ensuring that the trial process was truly adversarial.

With these considerations in mind, we have examined, both separately and cumulatively, the various unexplained omissions and delicts of Mr. Bellen to see if they undermine the reliability of appellant's con-

viction and sentence.[10] *See Strickland v. Washington* and *United States v. Scott,* both *supra.*

Before charges were referred for trial, Mr. Bellen attempted to waive the Article 32 investigation, but the summary court-martial authority ordered one anyway. Then, at that hearing, he inexplicably conducted no examination of any of the government witnesses—even Patti—and presented no evidence of his own. However, despite the absence of even minimal assistance on Holt's behalf by Mr. Bellen, the Article 32 officer recommended no court-martial—Patti's lack of credibility and the vagaries and ambiguities of her testimony being cited as the principal bases for his recommendation. Therefore, any omission on Mr. Bellen's part had no adverse effect on the recommendation.

The failure to cross-examine Patti at this time cost the defense an opportunity for discovery. However, Mr. Bellen may have feared that to cross-examine her might have tipped his own hand. Of course, whether he cross-examined her or not, Patti's testimony at the Article 32 investigation would have been admissible at trial if she had been unavailable as a witness. *Cf. United States v. Hubbard,* 28 MJ 27 (CMA), *cert. denied,* 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 101 (1989); *United States v. Spindle,* 28 MJ 35 (CMA), *cert. denied,* 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 101 (1989). Indeed, the risk of perpetuating adverse testimony may have been a reason for Bellen's attempt to waive the Article 32 hearing in the first place; and, by the same token, the convening authority may have decided to disregard the attempted waiver in order to perpetuate Patti's testimony in case she was unwilling or unable to testify at trial.

■ At appellant's arraignment, as indicated earlier in this opinion, Mr. Bellen acknowledged no difficulty at all with the preferral and forwarding of charges and failed to recognize the implications for the running of the statute of limitations. *See* RCM 907(b)(2)(B). While considerable study and analysis of this very close question both in the Court of Military Review and in this Court have led to conclusions by both tribunals that the statute was tolled, such a judgment is not an appropriate task for an advocate. To say that appellant had a good case to be made on this issue is, of course, to state the obvious. Yet, Mr. Bellen exerted no effort to make it, if he noticed the issue at all.[11] In this instance, his representation was inadequate; but, in view of our decision on the statute-of-limitations issue, Holt was not prejudiced by Mr. Bellen's omission.

■ When trial began, Mr. Bellen failed to conduct any *voir dire* of the court members, notwithstanding the emotionally charged nature of the allegations those members were to decide. Unfortunately, it does not appear that this was a conscious tactical or strategic decision; rather, from the following colloquy, it appears that Mr. Bellen eschews *voir dire* as a routine matter:

ATC: Your Honor, we have our witnesses scheduled for 1300 because we thought this would go for a while depending on voir dire. If you want, we could call them and have them here earlier if we—

10. Notwithstanding Holt's vigorous and wholesale assault on the competence of Mr. Bellen's representation from start to finish, the Government has not offered any affidavit or other extra-record explanation from Bellen concerning his questioned decisions, as frequently is offered where such challenges are lodged on appeal. *See, e.g., United States v. Stephenson,* 33 MJ 79 (CMA 1991). Accordingly, our evaluation of the adequacy of that representation against the reliability-of-results standard of *Strickland* and *Scott* is limited to the record before us and to fair inferences drawn therefrom, with due deference to counsel's tactical judgment, where such judgment is at all apparent. *See United States v. Bono,* 26 MJ 240, 242 (CMA 1988).

11. Mr. Bellen's very long and active career in Germany as a civilian defense counsel at courts-martial makes it questionable that he was not—or responsibly should not have been—aware of the command hierarchy and the court-martial processing responsibilities of the various components of that command.

MJ: Well, definitely do that, because my experience with voir dire with Mr. Bellen, it doesn't take very long.

IDC [Mr. Bellen]: Your recollection is accurate, Your Honor.

The Court of Military Review reasoned that Mr. Bellen's utter silence in this exercise must be considered in the context that "questions from the military judge and government counsel were sufficiently clear and comprehensive and insured that the members were not subject to the influence of pretrial publicity or were otherwise unable to be impartial." 31 MJ at 765.

From our examination of the extensive *voir dire* by the military judge and the relatively few questions asked by the prosecutor, we also conclude that Mr. Bellen's failure to question the members did not prejudice appellant. However, this failure to utilize *voir dire* of court-martial members is not a model to be followed; few experienced trial advocates would doubt the importance of such *voir dire* in uncovering possible latent blind spots and in preparing the members for a case of such emotional content as this one.

Earlier in this opinion, we concluded that various defense failures to object—and, hence, the waiver of the matter for appellate review—were not plain error. We have reexamined the virtual absence of defense objection before findings to consider whether, in any event, this represented a failure of adequate representation by civilian defense counsel.

In this connection, we have attempted to adhere to the view we expressed in *United States v. Rivas*, 3 MJ 282, 289 (1977):

We will not second-guess the strategic or tactical decisions made at trial by defense counsel, but where inaction occurs at a critical point where action is compelled by the situation—where, in other words, defense counsel remains silent where there is no realistic strategic or tactical decision to *make* but to speak up, then the accused has been denied [effective assistance of counsel].

Nonetheless, after close examination of the record—and giving due deference to deci-sions made by counsel at trial—we are unconvinced that these omissions displayed incompetence on Mr. Bellen's part in defending Holt against conviction.

■ Once Holt had been convicted, Mr. Bellen's effort to have some influence on what evidence the members would consider in sentencing was almost nonexistent. As appellant fairly puts it in his brief in this Court:

Civilian defense counsel's representation of SFC Holt during sentencing represents another breakdown in the adversarial process. The defense called no witnesses, and SFC Holt made no statements. Mr. Bellen registered no objections to Ms. Tate's testimony and did not cross-examine her. No objections were made to Patti's testimony, and the only question on cross-examination was whether she had said she wanted to put SFC Holt in jail, which she denied.

Although defense counsel had submitted some of SFC Holt's military records in mitigation, they were never explored or emphasized....

The severe penalty of 27 years' incarceration facing SFC Holt warranted a thoughtful and comprehensive mitigation case. What was offered, SFC Holt submits, was deficient and ineffective. Especially in light of Ms. Tate['s] assault on the whole "dysfunctional" Holt family, witnesses and evidence—not oratory—were essential for effective representation.

Subsequently, Mr. Bellen waived his opportunity to present any response to the staff judge advocate's recommendation to the convening authority. If nothing else, effective advocacy compelled some comment concerning the problem of the statute of limitations that the staff judge advocate had raised in that document for the first time in this case. Even if Mr. Bellen had not recognized the problem himself before or at trial, he surely was on notice of it at that point. Yet, a memorandum for record in the file indicates that, when the staff judge advocate's office telephoned, "Bel-

len's secretary indicated that no comments will be submitted." *See United States v. Palenius*, 2 MJ 86 (CMA 1977)(Trial defense counsel's responsibility to advise his client and to pursue and protect his client's interests continues after trial ends.).

In connection with Mr. Bellen's nonperformance after the findings of guilty were returned, we have attempted to fathom some explanation for his inactivity. Hampered by the absence of any explanation on his part, *see* n. 10, *supra*, we have simply been unable to ascertain any logical reason for Mr. Bellen's omissions after the findings of guilty were rendered. We, therefore, hold that his conduct during this portion of appellant's trial "so undermined the proper functioning of the adversarial process that the [sentencing proceeding] cannot be relied on as having produced a just result." *See Strickland v. Washington*, 466 U.S. at 686, 104 S.Ct. at 2064.

The post-findings inadequate representation has posed for us the issue as to whether incompetence after findings of guilty can be sufficiently isolated as to permit affirmance of the findings. In this instance, it appears to us that this can be achieved. *United States v. Stephenson*, 33 MJ 79 (CMA 1991). Accordingly, we conclude that the findings of guilty may be sustained but that Holt is entitled to a rehearing as to sentence.

## IX

The decision of the United States Army Court of Military Review is reversed as to sentence. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing as to sentence may be ordered.

Chief Judge SULLIVAN and Judge COX concur.