UNITED STATES, Appellee,

v.

Private E1 William G. AFLAGUE,
547–11–7602, United States
Army, Appellant.

ACMR 9102447.

U.S. Army Court of Military Review.

21 June 1994.

For Appellant: Captain Beth G. Pacella, JAGC (argued); Eugene R. Fidell, Esq. (on brief).

For Appellee: Captain Louis E. Peraertz, JAGC (argued); Lieutenant Colonel Joseph A. Russelburg, JAGC, Major Kenneth T. Grant, JAGC (on brief).

Before WERNER, LANE, and RUSSELL, Appellate Military Judges.

## OPINION OF THE COURT

WERNER, Senior Judge:

Contrary to his pleas, the appellant was convicted by a general court-martial composed of officer and enlisted members of unpremeditated murder in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (1988) [hereinafter UCMJ]. He was sentenced to a dishonorable discharge, confinement for ten years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved all of the sentence except the forfeiture of allowances.

### I.

The appellant contends, inter alia, that his conviction is unsupported by legally and factually sufficient evidence. Specifically, he argues that the prosecution failed to disprove beyond a reasonable doubt that he was acting in self-defense when he committed the homicide. We hold that his argument is without merit.

The test for legal sufficiency of the evidence is whether, considering the evidence in the light most favorable to the government, a court could rationally find the existence of every element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Blocker*, 32 M.J. 281 (C.M.A.1991). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, this court is itself convinced of the appellant's guilt beyond a reasonable doubt. UCMJ art. 66(c), 10 U.S.C. § 866(c); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987).

Where defenses are raised by the evidence, the prosecution must also prove beyond a reasonable doubt that any defense so raised does not exist. *United States v. Berri*, 33 M.J. 337 (C.M.A.1991); Rule for Courts–Martial 916(b) and (e) [hereinafter R.C.M.].

The defense of self-defense is available to an accused who uses deadly force to commit a homicide where the accused: (1) objectively or reasonably apprehended that death or grievous bodily harm was about to be inflicted upon him by a certain antagonist, and (2) subjectively believed that the force used by him was necessary for protection against death or grievous bodily harm from that antagonist. R.C.M. 916(e).

In this appeal, it is uncontested that the accused shot and killed Alexander Beli, the former boyfriend of a German woman, Eva Lindstam, who had since become the appellant's lover. Lindstam testified that she and Beli had lived together in her apartment for about eight months. Though his behavior appeared rational at first, Beli changed soon after moving in with her. He was frequently drunk, accrued numerous gambling debts, became unemployed, and was inclined to beat her. When she could no longer tolerate him, Lindstam forced him to move out and attempted to end their relationship.

Beli reacted to her action as "a lover scorned." He embarked on a campaign of threats upon her life and members of her family, abusive letters and telephone calls, and public assaults on her person and property. He frequently would stalk her, throw rocks or other objects at her car as she was driving on public roads, and attempt to run her car off the road. When he demanded that she apologize for ending their relationship, Lindstam had Beli arrested and served with a court order directing him to cease and desist his harassing activities, and ordering him to pay court costs. Beli became more enraged. His threats and harassment continued unabated and may have increased to such an extent that Lindstam no longer felt safe. At the appellant's invitation, she

moved in with him for protection and other comforts.

On the day of the incident which precipitated the charges, Lindstam was convinced she could not safely drive her car to work alone. Consequently, the appellant drove her to work at Ramstein Air Force Base and then met her at the end of the work day to drive her home. When he picked her up, she elected to drive home and the appellant sat in the passenger seat. After exiting the base, the appellant suddenly noticed Beli in the woods adjacent to the road. He told Lindstam to stop the van, got out, approached Beli, had words with him, and shot him three times with a 9-millimeter pistol he was carrying on his person. Lindstam testified that she did not observe the shooting, that she only heard one of the shots, and that she did not know the appellant had a pistol in his possession at the time he confronted Beli.

At trial, the appellant testified that he decided to speak to Beli after fortuitously seeing him in the woods outside the base. He told Lindstam to stop the van, took the pistol from the glove compartment, and entered the woods. He claimed that, as he confronted Beli, the latter told him that he was waiting to kill Lindstam and that he was also going to kill the appellant. Beli said some friends were nearby and warned the appellant that he had a gun. The appellant saw that Beli was angry and thought he

might be under the influence of drugs. When Beli approached him and made a reaching motion, the appellant said he became frightened and began shooting at him. In fact, Beli was unarmed. On cross-examination, the appellant explained that he wanted to speak to Beli in order to end the harassment.[1]

A passerby testified that he had heard four or five shots and noticed one man standing over another in the area from where the shots came. The man who was standing fled the scene; the other, identified later as Beli, staggered to the road where he was transported by a samaritan in a passing vehicle to the base hospital where he died of his wounds. In their investigation of the crime scene, the police discovered several cigarette butts, spent 9-millimeter cartridge casings, and an alarm clock.[2]

The German police apprehended the appellant at his apartment where they seized the pistol from him. The appellant first told them that the pistol was defective because a recoil spring was missing. He later said he threw the spring and ammunition away after leaving the scene of the killing. He admitted to them that he shot Beli as he confronted him about the harassment and because he thought Beli was reaching for a weapon to use against him.

---

1. At trial, the appellant testified:

   Sir, like I said, when—when we were coming, and we were going to take a right, and right when we took a right onto that street to Ramstein Village, and I seen him, everything blew up. I mean my anger—I was just tired, or—they told me not to say words I want to use, but I was tired of the asshole bothering us. I was tired of seeing my family, my thirteen-year-old scared of playing in his own back yard. I was tired of seeing Eva coming home shaking. You threw a penny to the—to the corner, and she's shaking. I was just tired of all the harassments. I was tired of living like a fugitive. I had to wait until everybody go to sleep; make sure that everything is secure, and wake up before them; make the coffee, and make sure the kids are up, and make sure she's okay. She had enough gas, in case they decide to attack her, or what.

   . . . .

   What I'm saying, sir, is—you've seen your family torn apart. You can't do anything. You—you report it. You seen them. You seen them suffering, and you hear all these people

who want to help, want to help, but they don't want to help, and then all of a sudden it was my turn. I blew up. I—sir, for six months since the incident, this is a nightmare for me. Nobody ever listened to us, and maybe now the jury can. I mean, I am sorry for what I did. Yes, I am an MP. But we asked for help. My kids asked for help. We—everybody asked for help. And the only thing we got out from the Germans is, "In time, in time, in time." And in time my family was going through hell. I was going through hell.

   When the prosecutor asked the appellant whether he began carrying the pistol because he thought he might use it against Beli, the appellant responded in the affirmative.

2. The government theorized that this evidence indicated that the appellant and Lindstam lured Beli to the woods so they could kill him or scare him into submission. Nevertheless, the court rejected this theory as it acquitted the appellant of premeditated murder.

The aforementioned evidence clearly establishes that the appellant cannot avail himself of the defense of self-defense. The evidence is legally sufficient as a trier of fact, viewing the evidence most favorably to the government, could have disbelieved the appellant's testimony concerning the reasonableness of his perception of the threat from Beli and the honesty of his belief that he had to use deadly force to save his own life. The court could have legitimately found that the appellant, who admittedly was predisposed to use the pistol, killed Beli out of frustration and anger rather than fear and the necessity to protect himself.

The evidence is also factually sufficient. Like the court below, we too are satisfied that the confrontation between the appellant and Beli was the result of the appellant's frustration with Beli's harassment and his inability to do anything about it through lawful means. In the first place, he did not have to confront Beli. Whether he did so by plan or accident is irrelevant as, in either event, the appellant was acting from the same motive—to end the harassment. That he confronted Beli while in possession of a pistol which he contemplated using against him indicates an aggressive predisposition. That he threw away the recoil spring and the ammunition suggests the appellant himself believed he was guilty.

## II.

The appellant also contends that his civilian trial defense counsel was ineffective in failing to submit matters to the convening authority in mitigation and extenuation pursuant to R.C.M. 1105. The allied papers reveal that after the staff judge advocate served his recommendation upon the defense counsel the latter acknowledged receiving it and requested a three-week delay to submit clemency matters. The parties agree that thereafter nothing was submitted on appellant's behalf and no explanation was given for the omission. But, they disagree as to whether the defense counsel's inaction amounts to ineffective representation.

■ The oft-cited two-part test for measuring a defense counsel's effectiveness provides that counsel's performance must be deficient and that the accused must be prejudiced from such deficient performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Scott*, 24 M.J. 186 (C.M.A.1987). Failure to submit post-trial clemency matters may constitute ineffective representation when there is no tactical reason to justify counsel's omission and when the accused is prejudiced thereby. *United States v. Stephenson*, 33 M.J. 79 (C.M.A.1991); *United States v. Dorsey*, 30 M.J. 1156 (A.C.M.R. 1990). Even where the defense counsel's performance does not amount to ineffective representation, if the government fails to explain on the record why the counsel did not submit clemency matters, it may result in this court ordering post-trial corrective action. *See United States v. Holt*, 33 M.J. 400, 412 (C.M.A.1991).

■ The principle enunciated in *Holt* provides that where there is no logical reason for counsel's failure to submit matters on behalf of an accused and where the record glaringly calls for the submission of such matters, the presumption of counsel effectiveness has been overcome and an appellate court should do something to cleanse the record of this apparent error. *Id.* The instant case has such a clarion call as the government has not obtained an affidavit from the trial defense counsel explaining why he did not submit matters to the convening authority. Of course, we could order a new recommendation and action. *Stephenson*, 33 M.J. at 83. However, we think it more appropriate and more judicially economical to reassess the sentence. *See United States v. Hill*, 27 M.J. 293, 296 (C.M.A.1988). While ten years of confinement and a dishonorable discharge may not seem too severe in light of the maximum punishment for unpremeditated murder (life imprisonment), there was ample mitigation and extenuation evidence that could have been presented to the convening authority that might have resulted in the sentence being reduced even further. Accordingly, we will reduce the confinement portion of the sentence by two years.

We have considered the other assigned errors as well as the matters submitted by the appellant pursuant to *United States v.*

*Grostefon,* 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted above and the entire record, the court affirms only so much of the sentence as provides for a dishonorable discharge, confinement for eight years, forfeiture of all pay, and reduction to Private E1.

Judge LANE and Judge RUSSELL concur.