CLARK, Judge,
joined by ORR and REED, Senior Judges (concurring), and
MOLLISON, Senior Judge
(concurring in part):
For the reasons that follow, I and the judges joining me concur with the lead opinion, except for a significant part of the discussion concerning Assignment of Error II (i.e., the conclusion that the Government did not prove the second aggravating factor). Contrary to the views of the lead opinion, we agree with the court-martial members that the appellant’s murder of his wife, Melinda, was preceded by either the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim.
We agree with the thrust of the holding expressed in the lead opinion that R.C.M. 1004(c)(7)(I) is constitutionally valid. Stated differently, in our opinion, the aggravating factor in R.C.M. 1004(c)(7)(I)[1] can exist only if (a) the accused specifically intended to inflict the required substantial harm or pain and suffering in addition to death, and (b) the victim actually experienced the harm or pain and suffering.
Whether this aggravating factor existed was a matter of factual determination, which the factfinders were required to find unanimously beyond a reasonable doubt. In our review of the legal sufficiency of evidence as to guilt or innocence, we must apply the “rational factfinder” standard of review established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This same standard of review is applied in federal habeas review of a state court’s finding of aggravating circumstances in a capital case. Lewis v. Jeffers, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Our review of the legal sufficiency of the evidence of the aggravating factor is analogous to that of federal habeas review of a state court’s finding of aggravating circumstances. We must view the evidence of the aggravating factor in the light most favorable to the sentencers’ findings in determining whether any rational sentencer could have found the existence of the aggravating factor beyond a reasonable doubt.
Our evaluation of the legal and factual sufficiency of the evidence in the appellant’s case is based on several well-accepted principles.
First, as the court-martial members were told, an accused’s intent may be proved by both direct and circumstantial evidence, and all relevant facts and circumstances should be considered in determining an accused’s intent. Record at 1460.
Second, “[sjpecific intent may be proved by circumstantial evidence. When grievous bodily harm has been inflicted by means of intentionally using force in a manner likely to achieve that result, it may be inferred that grievous bodily harm was intended.” Manual for Courts-Martial, United States, 1984, [MCM], Part TV, ¶ 54c(4)(b)ii. For example, in a case when there is evidence that an accused kicked the young victim in the stomach and repeatedly struck the victim with a belt, the court-martial members and this Court are free either to draw or to reject the inference that the accused intended to inflict grievous bodily harm. United States v. Gooden, 37 M.J. 1055, 1060 (N.M.C.M.R.1993).
Third, “[i]t may be inferred that a person intends the natural and probable consequences of an act purposely done. Hence, if a person does an intentional act likely to result in death or great bodily injury, it may be inferred that death or great bodily injury was intended.” MCM, Part IV, ¶ 43c(3)(a).
Fourth, “[i]n considering the record, [we] may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.” Article 66(c), Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 866(c) (1994).
*610 The evidence stated below permitted the court-members to properly conclude that the appellant specifically intended to inflict either substantial physical harm or prolonged, substantial mental or physical pain and suffering upon Melinda before killing her.
The testimony of numerous witnesses established that the appellant harbored animosity toward Melinda because of his perception that she was ruining his career through reports to his command of their domestic discord. This is indicative of a motive to punish her beyond merely snuffing out her life for profit. Evidence of the brutality of the beating allowed the members to infer that the appellant was motivated by this animosity during the attack immediately preceding Melinda’s death.
Nelson testified that first he heard a noise from the bedroom area. After a noticeable pause — “a few seconds later” — he heard Melinda asking the appellant to “stop hitting me.” Record at 1126. The pause after the initial blow argues against there being a frenzied flurry of blows to quickly snuff out her life. The evidence indicates that the pause lasted at least long enough for Nelson to get up from his seat at the dining room table, go down the hallway past the kitchen, and enter the bedroom. See Prosecution Ex. 39. Upon entering the bedroom he saw the appellant not raining blows upon Melinda, but “straddling her around the waist area with a tire iron in his hand held above her.” Record at 1126. At that time substantial harm had already been inflicted upon Melinda in the form of a crushed or broken nose. Id. After suffering this substantial harm Melinda had time to make several statements to the appellant before he struck her again. Id. After allowing Melinda to realize that she was hurt and to contemplate her impending death, the appellant continued beating her.
Further evidence that the appellant intended it to be a somewhat unhurried, rather than immediate, death may be inferred from his position during the beating. The sketch of the bedroom shows that there was ample room for the appellant to stand alongside the bed where he would have more leverage to strike far more forceful blows, possibly im-
mediately killing Melinda or, at least, rendering her unconscious. Instead, he chose to immobilize her upon an unsteady waterbed with his weight upon her waist area, thereby allowing a more deliberate punishment before administering the lethal blows. The counter argument, that a leisurely beating would attract attention of the neighbors, is weakened by the evidence that the neighbors were accustomed to sounds of discord coming from the Thomas household. Evidence that the appellant intended to make Melinda suffer first is further supported by evidence that he very efficiently silenced her with a few more blows after he allowed her to feel pain and contemplate her death. Record at 1126-27.
The appellant’s statement that it was messier than he thought it would be could be reasonably interpreted to mean that he had not expected her to bleed so much, just as well as it could be interpreted to mean that he did not expect it to take so long to kill her. Apparently the members interpreted it in the former manner. We find no fault with that interpretation.
The second prong of the analysis of the appellant’s intent involves whether he intended to prolong Melinda’s suffering prior to her death. Again we may consider the circumstances established by the evidence. The appellant decided to kill Melinda long before he actually attacked her; nevertheless, he did not immediately render her unconscious or strike killing blows. He crushed her nose, then menaced her with the tire iron while keeping her immobilized and helpless with his weight. After injuring Melinda, the appellant allowed enough time for her to experience the pain, beg him for mercy, and contemplate her death. We may infer from these circumstances that appellant intended the prolongation of Melinda’s agony. MCM, 1984, Part IV, ¶430(3)(3).
In the appellant’s case the members did not request and were not provided a definition of the term “prolonged.” Cf. United States v. Murphy, 30 M.J. 1040, 1058 (A.C.M.R.1990) (holding that instruction that “prolonged” meant “more than instantaneous” held not adequate). We do not find that a definition of that term was necessary. In *611 the absence of evidence to the contrary, the members may be presumed to have applied the normal and usual meaning of the term, which is based on a qualitative, rather than quantitative, analysis.[2] United States v. Holt, 33 M.J. 400 (C.M.A.1991); United States v. Rushatz, 31 M.J. 450 (C.M.A.1990).
The members found unanimously that “the murder was preceded by intentional infliction of substantial physical harm or prolonged substantial mental or physical pain and suffering to the victim.” Record at 1532 (emphasis added). This disjunctive finding is permitted by the plain language of the capital sentencing provision. See R.C.M. 1004(c)(7)(I).
In its analysis of the “heinous, cruel, and depraved” aggravating circumstances in the Arizona capital murder statute, the U.S. Supreme Court bifurcated the circumstances into those relating to the intent of the appellant and the one relating to the actual suffering by the victim. The Court held that the “cruel” circumstance referred to the suffering of the victim before death, but that the “heinous ..., and depraved” circumstances referred to the “mental state and attitude of the perpetrator as reflected by his words and actions.” Jeffers, 497 U.S. at 783, 110 S.Ct. at 3103-04. The Arizona trial court found that Jeffers’ murder of the victim had two aggravating circumstances: (1) he created a grave risk of death to another person; and (2) he committed the murder in an especially heinous, cruel, and depraved manner. After the Arizona Supreme Court reversed the finding as to the first aggravating circumstance, the Court of Appeals for the Ninth Circuit reversed the findings on the second. The U.S. Supreme Court held that there was not sufficient evidence for a rational factfinder to find that Jeffers’ victim had suffered. It held that evidence that Jeffers beat the dead victim and called her “a bitch and a dirty snitch” was evidence that a rational factfinder could have found to constitute an “especially heinous ... or depraved” murder.
Although the Arizona capital sentencing statute listed the aggravating circumstances of “heinous, cruel, and depraved in the conjunctive, the United States Supreme Court’s bifurcated treatment gave them disjunctive effect. The two prongs referring to the appellant’s intent in this case are clearly disjunctive, as is evident in the first connecting “or” in the wording of R.C.M. 1104(c)(7)(I).
The narrowing construction of this capital sentencing provision is adequately performed if analysis of the appellant’s intent is treated disjunctively. The members found unanimously that the appellant intended to inflict substantial physical harm upon Melinda or he intended to prolong her mental or physical pain and suffering. There is sufficient evidence for any rational factfinder to have made such findings.
Nelson testified that after Melinda’s nose was crushed, Melinda was conscious and apparently lucid enough to realize that she was hurt and possibly about to be killed. From the time it took for the sound of the first blow to register upon the mind of Nelson in the dining area, for Melinda’s cries to attract Nelson’s attention, and for Nelson to make his way from the dining area to the bedroom, Melinda was helplessly suffering a crushed nose under the weight of the appellant who straddled her and menaced her with an upraised tire iron. The physical suffering accompanying a crushed nose was further aggravated by the mental pain of realizing that her husband was about to kill her and she was helpless to prevent it.
There was medical testimony that, even after she was unconscious, Melinda survived for a period lasting from 20 to 45 minutes. There is insufficient evidence as to her suffering during her unconsciousness. However, her suffering before she was rendered unconscious is clearly established by the testimony of Nelson.
We are convinced that there was sufficient evidence for any rational factfinder to be convinced beyond a reasonable doubt that Melinda suffered prolonged, substantial mental and physical pain inflicted by the appellant before he killed her.
*612 We are, likewise, satisfied beyond a reasonable doubt that before killing Melinda, the appellant intentionally inflicted substantial physical harm or prolonged, substantial mental or physical pain and suffering upon her.
The numerical balance of votes on the existence of the second aggravating factor raises the issue of what constitutes the holding of the court on that finding of fact. We are of the opinion that an evenly-divided vote on that fact results in affirmance of the trial court’s finding on that fact.
The U.S. Court of Military Appeals (now the U.S. Court of Appeals for the Armed Forces) has held that when a Court of Military Review (now Court of Criminal Appeals) is evenly-divided on a question of law, application of the general rule of appellate practice results in affirmance of the lower court’s finding. United States v. Ohrt, 28 M.J. 301 (C.M.A.1989). In declining to address the effect of an evenly-divided Court of Military Review on a question of fact, the Court of Military Appeals noted the “well-reasoned opinion” of the U.S. Coast Guard Court of Military Review in United States v. Beckermann, 25 M.J. 870 (C.G.C.M.R.1988), aff'd on other grounds, 27 M.J. 334 (C.M.A.1989).
In Beckermann, the Coast Guard Court held that the general rule of appellate practice is not applicable to Courts of Military Review. 25 M.J. at 874. That Court reasoned that Rule 4(a) of the Courts of Military Review Rules of Practice and Procedure[3] requires that an affirmance be concurred in by a majority of the judges voting on the matter. The Court did not distinguish between questions of law and questions of fact, but relied upon the language of Rule 4(a) which indicates that the determination of any matter[4] shall be by a majority. Based upon the plain language of Rule 4(a) that reasoning has merit. However, based upon the holding in Ohrt, we perceive that applying a different criterion for review of questions of fact than for questions of law is not supported by Rule 4(a).
Applying the reasoning of Beckermann to this case, the holding of this Court would be determined by Rule 4(b) of the Rules of Practice and Procedure for Courts of Military Review. That rule requires that the determination of any matter before the Court be by a majority of the judges participating in the decision. Application of the rule according to its plain language would result in the general rule of appellate practice not applying to Courts of Criminal Appeals in questions of law as well as questions of fact. As to questions of law the Court of Appeals for the Armed Forces has held that the general rule does apply to Courts of Criminal Appeals. The existence of Rule 4(b) does not make the general rule any less applicable to questions of fact.
Even were we not satisfied beyond a reasonable doubt as to the existence of the second aggravating factor in this case, we would join the lead opinion in affirming the sentence approved on review below.
Senior Judges ORR and REED concur.

. "The murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim[.]”

. "[P]rolong, v.f. 1. to lengthen out in time; extend the duration of.” The Random House College Dictionary 1059 (Rev.Ed.1982).

. 22 M.J. CXXVII, CXXIX (1 March 1985). These Rules remain applicable to this Court notwithstanding the recent re-titling of the Courts of Military Review.

. The rule indicates that reversal of a lower court’s findings would also require a majority of the judges voting, since a decision to reverse is a "determination of any matter.” According to the rule, if there is no majority, an evenly-divided Court of Criminal Appeals can neither affirm nor reverse a lower court’s findings. Therefore, if the general rule of appellate practice does not apply to Courts of Criminal Appeals, the potential for a deadlock exists whenever an even number of judges votes on a matter. Applying the general rule of appellate practice removes this potential deadlock in the case of an evenly-divided appellate court.