# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40293**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jaquan Q. GREENE-WATSON**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 27 December 2023

————————————

*Military Judge*: Brett A. Landry.

*Sentence*: Sentence adjudged 3 March 2022 by GCM convened at Kirtland Air Force Base, New Mexico. Sentence entered by military judge on 17 May 2022: Bad-conduct discharge, confinement for 3 months, and a reprimand.

*For Appellant*: Major Heather M. Caine, USAF.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Major Joshua M. Austin, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, DOUGLAS, and WARREN, *Appellate Military Judges*.

Judge WARREN delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge DOUGLAS joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

WARREN, Judge:

At a general court-martial, a military judge sitting alone convicted Appellant, contrary to his pleas, of one charge and specification of communicating a threat, in violation of Article 115, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 915.[1,2] The military judge sentenced Appellant to a bad-conduct discharge, confinement for three months, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings or sentence, but deferred the adjudged reduction in grade until the entry of judgment, and waived the automatic forfeitures of pay.

Appellant raises five assignments of error which we have reordered and rephrased as follows: (1) whether Appellant's conviction for communicating a threat is factually and legally sufficient; (2) whether the military judge abused his discretion in admitting Mil. R. Evid. 404(b) evidence consisting of an alleged domestic violence incident which occurred 17 months after the charged offense; (3) whether the military judge abused his discretion in not excluding portions of the crime victim's unsworn statement where she criticized Appellant for not taking responsibility for, nor showing remorse for, his actions; (4) whether the military judge committed plain error by not *sua sponte* excluding portions of the crime victim's unsworn statement which were "beyond the scope" of victim impact evidence;[3] and (5) whether Appellant's sentence was inappropriately severe. We have carefully considered issues (4) and (5), and find no discussion or relief is warranted. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356 (C.M.A. 1987)). Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND[4]

Appellant and MGW met in Albuquerque, New Mexico, at the end of 2018 and married in March 2019. Six months into the marriage Appellant and MGW

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The military judge found Appellant not guilty of one charge and one specification of assault consummated by a battery upon a child under the age of 16 years, in violation of Article 128, UCMJ, 10 U.S.C. § 928.

[3] Appellant raised this issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] Unless otherwise noted, the facts in this section are derived from MGW's testimony in findings.

found out that they were going to have a child. Their son JGW was born in June 2020.

On 19 September 2020, Appellant and MGW had an intense verbal argument at their residence in Albuquerque. The young couple (Appellant then 22 years old and MGW then 19 years old) engaged in a heated exchange after MGW accused Appellant of trying to suffocate their three-month-old son JGW in the infant's crib in the nursery room of the couple's home. In the initial stages of the argument, Appellant attempted to wrest hold of JGW away from Appellant, but Appellant refused to release him. He yelled, "get off of me," as MGW grabbed Appellant's arm to try to get him to turn loose of JGW. Appellant then leaned into the crib and picked up the baby from under his armpits and, from MGW's perspective, started shaking him. Appellant then took JGW inside of the couple's bedroom and locked the door, at which time MGW heard what sounded like Appellant yelling at JGW, who continued to cry the entire time.[5]

When Appellant re-emerged from behind the locked door several moments later, MGW approached him to retrieve JGW from him. Appellant then told MGW, "If you come near me again, I'm going to throw [JGW]." MGW was temporarily scared to respond. She waited until Appellant walked over to a nearby desk, sat down, and sat JGW upon his lap, when MGW was able to seize the opportunity to take JGW from him. After MGW took the baby, Appellant stood up and feigned a punch toward MGW by putting his fists up and making a small swing. MGW flinched and Appellant responded by stating words to the effect of, "That's why you're scared." Then Appellant took an actual swing at MGW but missed and in the process grazed the top of JGW's head with his fist.

MGW was worried that JGW would get seriously hurt if she continued to hold him while Appellant took swings and therefore set her son down on the couch near her. After she set JWG down, Appellant pushed MGW to the ground. MGW laid on the floor for several minutes trying to process what had

---

[5] We are cognizant that Appellant was acquitted of the Article 128b, UCMJ, charge and specification alleging that he suffocated his son. In citing to surrounding circumstances around that acquitted misconduct, we are considering it only for the limited permissible purpose of providing context to the emotional atmosphere in which Appellant's convicted misconduct occurred. *See United States v. Rosario*, 76 M.J. 114, 118 (C.A.A.F. 2017) ("Defendants are generally acquitted of offenses, not of specific facts, and thus to the extent facts form the basis for other offenses, they remain permissible for appellate review.").

just happened, and then got up, grabbed JGW, went downstairs, picked up her phone,[6] and began audio recording.

That recording became the primary evidence for the threat Appellant was convicted of communicating. As captured by that audio recording, MGW continued to accuse Appellant of trying to hurt their son, telling Appellant: "He [JGW] could f[**]king died right there." That accusation prompted Appellant to direct the following statement towards her in an adamant and agitated tone:[7]

> I don't give a f[**]k. And if he did, then I'd be happy.
>
> If you keep trying me, I swear to God, you better not come back in this house.
>
> . . . .
>
> After you leave that door—after you leave that door, if it's not with the police—*it is in your best interest if you wish to continue breathing and trying to live a life [do] not come back through that door.*
>
> . . . .
>
> Try and come back through that door without the police and see what happens.

(Emphasis added).

Following this verbal exchange, MGW took her son and left the residence, called her mother, and then called 911 while at a gas station down the street approximately a block and a half from the residence. That recording was admitted into evidence at trial and predominantly features MGW recounting the events recited above. At the direction of the 911 dispatcher, MGW returned to the residence, but remained in her vehicle to await the arrival of police.

Meanwhile, Appellant also called 911 and provided a counter-narrative of sorts, telling the 911 dispatcher that he was "just playing with [JGW]'s jaw" and "trying to get him to quiet down" when MGW inexplicably started screaming at him. Appellant omitted any mention of his own comments to MGW (recited above).

---

[6] MGW believed that Appellant threw her phone downstairs at some point in time during the incident but could not identify precisely when in the timeline of the events that took place.

[7] The court listened to the audio recording (Prosecution Exhibit 1) and based its evaluation of Appellant's tone upon that recording.

Police responded to the couple's residence to interview both MGW and Appellant. Following MGW's brief on-scene interview JGW was taken to the hospital where he stayed for three days for testing, evaluation, and an investigation. In the meantime, Appellant was taken into pretrial confinement by civilian law enforcement. As a young wife, predominantly dependent upon Appellant for financial support for herself and their young son, MGW initially sought to minimize her allegations against Appellant. At a bail hearing on 25 September 2020, she provided a sworn affidavit and testimony where she claimed Appellant was trying to calm JGW down and that he was not trying to harm JGW. As a result, Appellant was released from civilian custody and returned to the marital home where he continued living together with MGW and JGW until February 2022.

By the time of Appellant's court-martial in March 2022, MGW had decided to retract her statements she had provided in the fall of 2020 to civilian law enforcement, as well as to the Air Force Office of Special Investigations (AFOSI), when she was still seeking to spare Appellant criminal prosecution. During her trial testimony, MGW affirmed her allegations that Appellant had threatened her on 19 September 2020, consistent with her phone recording of 19 September 2020 (Prosecution Exhibit 1). At trial MGW testified she felt "sad, scared, horrified, all at the same time I was very shocked" upon hearing Appellant's threatening language directed at her on 19 September 2020. At trial, she also explained why she continued to reside with Appellant, explaining she was financially and emotionally dependent on Appellant and she "just wanted to protect him with – just tried to get him out . . . of jail." MGW further testified that she regretted providing prior false minimizing statements to law enforcement, attributing them to her emotional turmoil at the time.

## II. DISCUSSION

### A. Factual and Legal Sufficiency—Communicating a Threat

Appellant does not dispute that he communicated the language captured in MGW's audio recording of 19 September 2020. Rather, he challenges the "threatening nature" of the language because he asserts that MGW herself was not "scared" of Appellant's threat; he further asserts his communication was not "wrongful" because he did not intend MGW to perceive it as a death threat.

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United*

*States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). The term "reasonable doubt" does not mean evidence free from conflict. *See Lips*, 22 M.J. at 684. This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of communicating a threat in violation of Article 115, UCMJ, which required the Government to prove the following three elements beyond a reasonable doubt: (1) Appellant communicated certain language, expressing a present determination or intent to injure MGW presently or in the future;[8] (2) that the communication was made known to a certain person, to wit: MGW; and (3) that the communication was wrongful. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 53.b.(1).

---

[8] The specification alleged the following threatening language: that Appellant "wrongfully communicate[d] to [MGW] a threat to kill her if she returned to their shared residence."

There is a paucity of case law concerning the current iteration of the offense of communicating a threat under Article 115, UCMJ (effective 1 January 2019), as the majority of caselaw addresses its predecessor under Article 134, UCMJ.[9] However, the substantive elements of the Article 115, UCMJ, offense mirror those of the Article 134 offense, with the exception that the Article 134 terminal element is no longer applicable. *See MCM*, App. 17, at A17-9. The 2019 *Manual for Courts-Martial* also explicitly notes that in "migrating" this offense from Article 134 to Article 115, UCMJ, it explicitly incorporated the prior caselaw interpretations to the "explanation" sections of the Article 115, UCMJ, offense. *Id.* ("The explanations for threat and wrongful are amended and are consistent with *Elonis v. United States*, 135 S. Ct. 2001 (2015), and *United States v. Rapert*, 75 M.J. 164 (C.A.A.F. 2016)."). Accordingly, the prior Article 134 caselaw is applicable to our analysis in this case of the current article.

The United States Court of Appeals for the Armed Forces (CAAF) most recently construed the elements of "communicating a threat" in *United Sates v. Harrington*, 83 M.J. 408 (C.A.A.F. 2023), albeit in an Article 134 context. The CAAF provided a helpful summary of the *mens rea* requirements embedded within the offense as follows:

> The first element of communicating a threat requires an objective inquiry, analyzing the existence of a threat from the viewpoint of a "reasonable person *in the recipient's place*." This objective inquiry examines both the language of the communication itself as well as its surrounding context, which may qualify or belie the literal meaning of the language. In contrast to the first element, the third element's requirement of wrongfulness is properly understood in relation to the *subjective* intent of the speaker. In determining if the speaker's subjective intent was wrongful under the third element, the key question is not whether the speaker intended to carry out the object of the

---

[9] There are currently no opinions from this court or the United States Court of Appeals for the Armed Forces (CAAF) substantively considering Article 115, UCMJ, iteration of the "communicating a threat" offense. The only published opinion construing the elements of Article 115, UCMJ, comes from the United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) in *United States v. Taylor*, 82 M.J. 614 (N.M. Ct. Crim. App. 2022). Unfortunately, *Taylor* is unhelpful in this case as it addresses legal sufficiency as to the second element of the offense—that the communication was made known to a certain person—and that issue is uncontested in this case. We note however that in construing the current Article 115, UCMJ, the NMCCA relied on the CAAF's prior jurisprudence considering the predecessor Article 134, UCMJ, offense, *id.* at 624–25 (citing *United States v. Rapert*, 75 M.J. 164, 169 (C.A.A.F. 2016))—as do we.

threat, but rather "whether the speaker intended his or her words *to be understood as sincere.*"

*Id.* at 414 (first citing *United States v. Phillips*, 42 M.J. 127, 130 (C.A.A.F. 1995); then citing *United States v. Brown*, 65 M.J. 227, 231 (C.A.A.F. 2007); and then citing *Rapert*, 75 M.J. at 169, 169 n.10)).[10] To summarize then, an assessment of whether the language was sufficiently "threatening"—the first element—is judged from the *objective perspective*. An assessment of whether the appellant intended the target of his communication to perceive it as a threat, or that he knew she would interpret it as a threat—the third element—is viewed from the *subjective perspective*.

In addition, two additional principles gleaned from the "communicating a threat" jurisprudence are also applicable to the case at bar. First, in evaluating whether the language was objectively threatening under the first element, the subjective perceptions of the target of the threat are relevant to, but not dispositive of, that issue. *See United States v. Shropshire*, 43 C.M.R. 214, 215–16 (C.M.A. 1971) (explaining appellant's putative threat to attack his prison guard "if you take this restraining gear off" was not objectively threatening language, notwithstanding the subjective fear of the prison guard, because there was no reasonable possibility that appellant's restraints would be removed to enable him to attack the guard). Second, in evaluating whether the alleged threatening language evidenced a present determination by an accused to inflict injury presently or in the future, a "conditional threat" (*i.e.*, a threat premised upon the occurrence of a future event) negates the required immediacy of a threat only if "the threatened injury is stated to be contingent on the occurrence of some event that obviously cannot take place" or "if there was no reasonable possibility that the event upon which the threat was conditioned

---

[10] We pause here briefly to note that *Harrington* (issued in August 2023) omitted mention of the United States Supreme Court's decision in *Counterman v. Colorado*, 143 S. Ct. 2106 (2023) (issued in June 2023), which was the Supreme Court's most recent discussion of First Amendment constraints on criminal statutes. The Supreme Court in *Counterman* employed a similar framework as the CAAF in construing the requisite *mens rea* in "threats" cases. It construed the *mens rea* requirement for a Colorado stalking statute where the defendant made online communications that the victim perceived as threatening but which the defendant did not. *Id.* at 2112. The Supreme Court ultimately arrived at essentially the same conclusion as the CAAF in the *Phillips/Rapert* line of "threats" cases, to wit: applying an objective standard to assess the threatening nature of the language, and a subjective standard for whether the communication was intended to be perceived as threatening by the target. *See id.* at 2113.

Appellant concedes that *Counterman* did not change the Article 115, UCMJ, evidentiary landscape because that article already imposes the objective-subjective analysis for the first and third elements effectively endorsed by the Supreme Court's approach in *Counterman*. We concur.

would ever happen." *Phillips*, 42 M.J. at 131 (first citing *United States v. Alford*, 34 M.J. 150, 152 (C.M.A. 1992); then citing *Shropshire*, 43 C.M.R. at 215–16 (additional citation omitted)).

**2. Analysis**

Appellant challenges only the first and third elements of the offense in this case. That is, while he concedes he made the communication at issue, Appellant asserts that his conviction for communicating a threat is both legally and factually insufficient by arguing: (1) Appellant's language to MGW was not objectively "threatening" because it made no explicit mention of killing; (2) Appellant's threat to MGW was "conditional" and therefore not sufficiently immediate; and (3) Appellant's threatening language was not wrongful but instead a "melodramatic response" to MGW's allegations against him regarding their son. For the reasons set forth below, each of these arguments fail, and none of them undermine our confidence that the evidence presented at trial established Appellant's guilt beyond a reasonable doubt. Instead, we are convinced beyond a reasonable doubt that Appellant directed objectively threatening words towards MGW, which an objective observer in her place would have perceived as a death threat. We also conclude that, under the totality of the circumstances, Appellant intended his words to be perceived by MGW as a threat, or at a minimum, knew that she would perceive his threat as sincere. *See Harrington*, 83 M.J. at 414.

### a. Element 1—Threatening Language Analysis

#### i) Application of objective standard to "threatening" language

Whether language qualifies as "threatening" for purposes of Article 115, UCMJ, is measured from a "reasonable person *in the recipient's place*"—that is, from an objective perspective evaluating both the language of the communication itself as well as its surrounding context. *Id.* We conclude an objective person in MGW's position would have interpreted Appellant's words—*i.e.*, "if you wish to continue breathing and trying to live a life [do] not come back through that door"—as an express death threat not to return home.

Appellant endeavors to avoid this conclusion by suggesting that MGW did not really have a subjective fear of Appellant's death threat, and then arguing that if a victim lacks subjective fear of an accused's putative threats, the language cannot satisfy the objective standard for threatening language under the first element. In so doing, Appellant misapprehends both the facts at trial and the law on appeal. The fact is that MGW ultimately testified that she was "sad, scared, horrified, all at the same time . . . [and] very shocked" when Appellant directed his threatening language towards her. The law is that whether the specific language qualifies as a threat *(i.e.*, communicates a present

determination to injure presently or in the future) is evaluated through the objective perspective of a "reasonable person *in the recipient's place*." *Harrington*, 83 M.J. at 414 (citing *Phillips*, 42 M.J. at 130).

First, in analyzing whether the language used was "threatening" we start with the language itself. Here, the language used was menacing on its face: "[I]t is in your best interest if you wish to continue breathing and trying to live a life [do] not come back through that door." The literal meaning of those words, particularly the phrase "if you wish to continue breathing," is a death threat.

Arguing to the contrary, Appellant asserts from MGW's own testimony that she told AFOSI, when first interviewed concerning the 20 September 2020 incident, that she *did not* fear for her safety when Appellant directed those words at her. To the extent that the recipient's subjective fear (or lack thereof) is relevant to, but not dispositive of, the issue of whether the language was objectively threatening under the circumstances, *see Shropshire*, 43 C.M.R. at 215–16, we turn to MGW's trial testimony. At trial, MGW explained that she was lying to AFOSI agents in order to protect Appellant from further repercussions of his own behavior. Contrary to Appellant's contentions, MGW did testify to the profound emotional disturbance Appellant's threatening language created in her mind: "I had a lot of emotions, like the big -- the main ones is [sic] I was sad, *scared*, horrified*,* all at the same time I was very shocked." (Emphasis added). Furthermore, MGW's 911 phone call audio from 19 September 2020 (admitted into evidence at trial) constituted prior consistent statements as to her emotional state of mind at the time of Appellant's threats. Thus, to the extent that a victim's lack of subjective fear of the alleged threatening statements could serve to vitiate the threatening nature of the statements in an appropriate case—this was not the case here.

Second, nothing about the surrounding circumstances argued by Appellant "belie[s] the literal meaning" of his death threat to MGW on 19 September 2020. *See Harrington*, 83 M.J. at 414. Appellant is correct that surrounding circumstances must be considered to contextualize the alleged threating language, as the CAAF has held that a person in the recipient's place is familiar with all the surrounding circumstances because "context gives meaning to literal statements." *Brown*, 65 M.J. at 231. But here those surrounding circumstances included a tumultuous fight over allegations that Appellant had just abused the couple's three-month-old son. Moments immediately preceding the charged threatening language, Appellant made punching gestures at MGW. Evaluated through the objective perspective of a reasonable person in MGW's place, the contemporaneous timing of Appellant's menacing gestures, combined with the literal meaning of his words, and the agitated and adamant tone in which he uttered those words, all support the conclusion that the

language manifested a present intent by Appellant to injure MGW at the time he uttered the threats or in the immediate future.

### *ii) Conditional threats*

Appellant argues that the condition contained in Appellant's threat to MGW of "if you wish to continue breathing . . . [do] not come back through that door" negated the immediacy of the implicit death threat contained in that statement. We are unpersuaded. A threat conditioned upon a victim's actions does not preclude a finding that the language used manifested a then-existing determination to injure. *See United States v. Jones*, No. ACM 39766, 2021 CCA LEXIS 73, at *34 (A.F. Ct. Crim. App. 17 Feb. 2021) (unpub. op.). Rather, it is only "[if] the threatened injury is stated to be contingent on the occurrence of some event that *obviously cannot take place,* [that] an accused is not criminally liable." *Id.* (citing *Alford*, 34 M.J. at 152 (emphasis added)); *see also Phillips*, 42 M.J. at 131 (holding appellant's conditional threat to victim of "keep your mouth shut and you will make it through basic training just fine" was still a threat where there was no reason proffered at trial which would have prevented victim from discussing appellant's misconduct with others). In addition, unlawful conditions imposed by an Appellant as part of their threatening language do not serve as a basis for undermining the threat. *See Alford*, 34 M.J. at 151 ("[I]mposition of a wrongful condition 'does not negative a present determination to injure.'") (quoting *United States v. Holiday*, 16 C.M.R. 28, 33 (C.M.A. 1954) and citing *Shropshire*, 43 C.M.R. at 215)).

Here, Appellant's condition on his death threat, that MGW not return to their marital residence, was both illegal and more than reasonably possible of being fulfilled by MGW. Appellant had no legal right to restrict MGW's access to the home where she had a legal right to reside. We also conclude that the illegality of that condition by Appellant serves to provide circumstantial evidence that Appellant's intent in issuing his death threat was wrongful. That is, it tends to demonstrate that Appellant's objectively threatening language was not offered as idle banter or in jest—it was offered to intimidate.

### b. Element 3—"Wrongfulness" Analysis

Appellant's final argument misperceives the focus on the "wrongfulness" analysis by placing undue emphasis on the purported absence of intent by Appellant to carry out the threat. The wrongfulness of a threat is not reliant upon an accused's intent to implement it, but on his intent that the threat be *understood as sincere*. *Harrington*, 83 M.J. at 414 (citing *Rapert*, 75 M.J. at 169 n.10). Appellant argues that his threats uttered while in a "highly emotional state" are not wrongful—because they were an "unplanned reaction to an exaggerated claim that MGW had just made against him during their heated fight." But as a matter of law, no intent to carry out the threatened act is required to

render a threat wrongful. Instead, threatening language is wrongful if it is meant to be understood as sincere in the moment. *See id.* ("[T]he key question is not whether the speaker intended to carry out the object of the threat, but rather 'whether the speaker intended his or her words *to be understood as sincere.*'"(Citation omitted)). Indeed, the fact that a threat was uttered while Appellant was in a highly agitated state tends to demonstrate that it was more, not less, sincere. We find that a rational trier of fact could conclude that Appellant's statement was sincere and therefore wrongful. While Appellant posits that the allegation of child abuse leveled at him by his wife in the moments before he issued his threat, and the angst that it produced in him which motivated him to utter the threatening language, absolves him of criminality, we conclude that in fact, it tends to prove it. In short this was no mere "emotional outburst"—it was a crime of passion. Since its early days, our superior court has relied upon similar reasoning, remarking in *United States v. Davis* that:

> [a]ppellate defense counsel maintain that the statement was made when the accused was emotionally upset and that it was, therefore, not made in earnest. It seems to us that the converse is clearly true. Threats are most likely to be made while the speaker is in an emotional state, and those are the threats most likely to speak the truth about the speaker's seriousness . . . . While words spoken in anger are often regretted upon calm reflection at a later period, this premise does not argue that at the time they were pronounced they did not reflect the then mental attitude of the speaker.[11]

19 C.M.R. 160, 163 (C.M.A. 1955).

While we acknowledge it is also possible that in an agitated state--particularly an argument--the speaker could say something outrageous to be emotionally hurtful (without intent to execute the threatened act), that fact alone does not undercut "wrongfulness" because it does not undercut the likelihood that the speaker wants their message to be *perceived* as sincere. Here, the evidence demonstrates that, agitated by his wife's accusation, Appellant immediately made menacing gestures towards her and uttered menacing words—with purpose. We carefully examined the record of trial, cognizant of the CAAF's admonition in *Brown* that we "must pay due regard to any concretely expressed contingency associated with a threat, while remaining aware that all

---

[11] To the extent that Appellant in his brief invites us to rely upon Judge Latimer's concurrence in *United States v. Humphrys*, 22 C.M.R. 96, 101 (C.M.A. 1956) (Latimer, J., concurring in the result), for the proposition that "emotional outbursts" cannot constitute wrongful communication of a threat—we expressly decline that invitation.

communication takes place within a context that can be determinative of meaning." 65 M.J. at 231 (citations omitted). But evaluating the surrounding context in this case, we see no history of Appellant leveling hollow threats, or engaging in off-color "jokes" involving similar language, that would indicate anything other than sincerity on Appellant's part when he communicated his threatening language. *Cf. id.* (noting "if the threatening individual has a history of tantrum threats but has never acted on them, the calculus of the alleged threat changes"). Nothing about Appellant's agitated and adamant tone indicates to us that his words were in jest, "idle banter," or for any innocent "legitimate purpose" (*see Rapert*, 75 M.J. at 169)—indeed an implicit threat to kill your spouse if she leaves then ever returns to your marital home is anything but a legitimate purpose.

In conclusion, as to legal sufficiency, viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found the essential elements beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. As to factual sufficiency, while Appellant focuses on the counter-intuitive behavior of MGW prior to trial as a basis to undermine her credibility, we find the recording of the threat persuasive in demonstrating Appellant's guilt by showcasing the explicit terms of the threat and Appellant's enraged and adamant tone when uttering it. Whether MGW was subjectively "scared" of Appellant's threatening language is not dispositive—the issue is whether he intended her to take his threat as sincere. The fact that MGW did not continue to cower in the presence of Appellant's threats does not prove his innocence. Indeed, MGW was sufficiently concerned with Appellant's conduct on 19 September 2020 that she dialed 911 and fled the residence—she evidently took his threatening language as sincere. Accordingly, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41.

## B. Admissibility of Uncharged Misconduct Occurring After Charged Misconduct

Appellant claims the "military judge abused his discretion by admitting evidence of alleged conduct involving domestic violence occurring 17 months after the charged offense of communicating a threat under the theory of a common scheme or plan." We find the military judge did not abuse his discretion in admitting the evidence concerned.

### 1. Additional Background

On 6 February 2022, a separate, uncharged domestic violence incident between MGW and Appellant occurred, which ultimately ended their relationship. This argument started when Appellant criticized MGW, via text message,

for going out shopping with her mother and in Appellant's mind, "just making an excuse to not watch your son." MGW and Appellant then had an in-person argument which turned violent, with Appellant throwing MGW's phone to prevent her from recording the incident, physically restraining her, and trying to prevent her from leaving the family residence. Once MGW did manage to leave the residence on 6 February 2022, Appellant harassed her with persistent phone calls that day and the following day, and then withdrew all the money from the couple's checking account and shut down the utilities in the couple's home prior to her return to the residence on 7 February 2022.

Before trial, the Government gave the Defense notice of its intent to introduce uncharged misconduct, mostly stemming from the 6 February 2022 incident, to show, *inter alia*, Appellant's plan to control MGW. The Defense moved *in limine* to exclude such evidence. After an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session prior to trial on the merits, and after articulating the *Reynolds*[12] test and other applicable caselaw, the military judge issued a written ruling stating the Government could argue the following to show "a common scheme or plan":

> [Appellant] physically got on top of [MGW] and twisted her side with his hand, causing a 9 out of 10 pain level, leaving a red mark.
>
> [Appellant] balled up his fists and acted like he was going to hit [MGW].
>
> [Appellant] told [MGW] he was going to "put a bullet" in her back.
>
> [Appellant] took [MGW]'s phone and threw it, stating he did so "since [she's] gonna be a dumb bi[**]h" and record him.
>
> [MGW] ran to the vehicle with the couple's child, [JGW,] and locked herself inside. [Appellant] placed his foot behind the wheel so she couldn't reverse the vehicle and pounded on the windows, yelling at [MGW].
>
> [MGW] left the residence with the couple's child and stayed in a hotel for safety. [Appellant] called her approximately seven times, demanding she return their vehicle. [Appellant] turned off all of the couple's credit cards and removed all of the cash from the joint bank account.

---

[12] *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989).

> On or about 7 or 8 February 2022, [Appellant] shut off the utilities in [MGW]'s home.
>
> In the past, [Appellant] has turned off all credit cards and taken [MGW]'s car keys following arguments.

(Ninth alteration in original).

Additionally, facts developed at the motions hearing demonstrated that, as with the threat incident involving the charged misconduct in September 2020, Appellant pre-emptively called 911 on 6 February 2022 to provide his rendition of facts which was false in several particulars to law enforcement. He falsely informed police that MGW was attempting to "steal his car" when in fact she was trying to flee their home in her car following the Appellant's alleged threats to her on 6 February 2022.

After articulating the *Reynolds* test and applicable caselaw on the "common plan or scheme" theory, the military judge ruled that each piece of evidence listed above was admissible under that rubric. In his ruling, the military judge identified the putative common plan or scheme at issue, *to wit*, a common plan or scheme to "frustrate MGW's ability or willingness to report these allegations by taking actual steps to prevent her from reporting to increase his control over her so as to deter her from making a report."

### 2. Law

We review a military judge's decisions to admit evidence pursuant to Mil. R. Evid. 404(b) for an abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citation omitted). "An abuse of discretion occurs when a military judge's decision is based on clearly erroneous findings of fact or incorrect conclusions of law." *United States v. Hernandez*, 81 M.J. 432, 437 (C.A.A.F. 2021) (citation omitted). "To reverse for an abuse of discretion involves far more than a difference in . . . opinion. . . . The challenged action must . . . be found to be arbitrary, fanciful, clearly unreasonable, or clearly erroneous in order to be invalidated on appeal." *Hyppolite*, 79 M.J. at 166 (omissions in original) (citation omitted).

Military Rule of Evidence 404(b) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, proving motive, plan, intent, or the absence of mistake. Mil. R. Evid. 404(b)(2). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson*, 28 M.J. 104, 108 (C.M.A. 1989). Military Rule of Evidence 404(b) "is a rule of inclusion rather than exclusion," *United States v. Browning*, 54 M.J. 1, 6

(C.A.A.F. 2000), authorizing admission of the proffered evidence so long as it has a legitimate, non-propensity use at trial.

Pertinent to this case, evidence of a common plan or scheme has long been recognized as a legitimate, non-propensity purpose under Mil. R. Evid. 404(b). *See, e.g., United States v. Johnson*, 49 M.J. 467, 474–75 (C.A.A.F. 1998); *United States v. Munoz*, 32 M.J. 359, 364 (C.M.A. 1991); *United States v. Reynolds*, 29 M.J. 105, 105–06 (C.M.A. 1989). In *Hyppolite*, the CAAF revisited the parameters of common plan or scheme evidence. The CAAF endorsed a substantial similarity test employed by the military judge in assessing whether the evidence qualified as a common plan or scheme, and affirmed the trial judge's reliance upon a three-factor test in ruling upon the evidence: (1) relationship between the alleged victim and the accused; (2) surrounding circumstances of the preceding misconduct; and (3) nature of the alleged misconduct involved. *Hyppolite*, 79 M.J. at 166–67.[13]

Military Rule of Evidence 404(b) can be applied to subsequent acts committed after the charged misconduct. Some of the most common examples include efforts by an appellant to obstruct justice or intimidate witnesses. *See, e.g., United States v. Young*, 55 M.J. 193, 196 (C.A.A.F. 2001); *United States v. Dorsey*, 38 M.J. 244, 246 (C.M.A. 1993). However, the rationale also extends to the use of *post*-misconduct evidence to prove *prior* intent, motive, or state of mind generally, as our superior court has reasoned: "Depending upon the circumstances involved in a particular case, subsequent conduct showing a subsequent state of mind may be relevant to show an earlier state of mind at issue." *United States v. Colon-Angueira*, 16 M.J. 20, 25 (C.M.A. 1983) (citation omitted).

The CAAF's approach follows a majority of the federal circuit courts, including the 1st, 4th, 5th, 7th, 10th, 11th, and D.C. circuits, which permit post-misconduct evidence under Fed. R. Evid. 404(b).[14] Moreover, as the CAAF

---

[13] In adopting a "substantially similar" test for common plan or scheme evidence, the CAAF appeared to *sub silentio* either overrule, or at a minimum distinguish, the reasoning from an earlier common plan or scheme evidence case: *United States v. Morrison,* 52 M.J. 117, 122 (C.A.A.F. 1999)). In *Morrison*, the CAAF held that such evidence "must be *almost identical* to the charged acts and each other . . . so as to naturally suggest that all these acts were results of the same plan." *Id.* (emphasis added) (quoting *United States v. Brannan*, 18 M.J. 181 (C.M.A. 1984)). We decline Appellant's suggestion we employ that "almost identical" standard implicitly rejected in *Hyppolite*.

[14] *See United States v. Nguyen*, 504 F.3d 561, 573–74 (5th Cir. 2007) (subsequent fraudulent sales admitted to show knowledge and criminal intent); *United States v. Peterson*, 244 F.3d 385, 392 (5th Cir. 2001) ("Our prior decisions clearly allow for evidence

noted in *Young*, this is consistent with the drafters' intent of the original Fed. R. Evid. 404(b), upon which Mil. R. Evid. 404(b) was modeled: "Under [Fed. R. Evid.] Rule 404(b), evidence of other crimes, wrongs, or acts may include acts committed prior to, simultaneous to, or after the charged offense . . . ." *Young,* 55 M.J. at 196 (omission in original) (citing 29 Am. Jur. 2d, *Evidence* § 415 (1994)).

We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b):

> 1. Does the evidence reasonably support a finding by the court members that appellant committed [other] crimes, wrongs or acts?
>
> 2. What "fact . . . of consequence" is made "more" or "less probable" by the existence of this evidence?
>
> 3. Is the "probative value . . . substantially outweighed by the danger of unfair prejudice"?

*Id.* at 162 (quoting *Reynolds*, 29 M.J. at 109) (additional citations omitted).

As related above, the third prong of the *Reynolds* test essentially involves applying a Mil. R. Evid. 403 balancing test. However, when a military judge does not conduct the balancing inquiry of the third prong of the *Reynolds* test on the record, we afford that ruling less deference. *United States v. Barnett*, 63 M.J. 388, 396 (C.A.A.F. 2006).

The flagrancy of the charged versus uncharged misconduct is a factor in conducting this balancing test. However, the more significant the charged misconduct, the less threat of "unfair prejudice" posed by admission of the uncharged misconduct because "[a]ny prejudicial impact based on the shocking

---

of 'bad acts' subsequent to the subject matter of the trial for the purpose of demonstrating intent." (Citations omitted).); *United States v. Crowder*, 141 F.3d 1202, 1208 (D.C. Cir. 1998) (intent and motive evidence—uncharged misconduct seven months after charged misconduct); *United States v. Latney*, 108 F.3d 1446, 1449 (D.C. Cir. 1997) (knowledge and intent evidence—uncharged misconduct eight months after the charged misconduct); *United States v. Buckner*, 91 F.3d 34, 36 (7th Cir. 1996) (intent evidence—uncharged misconduct four to six months after the charged misconduct); *United States v. Procopio*, 88 F.3d 21, 29 (1st Cir. 1995) (intent evidence—uncharged misconduct evidence two years after the charged misconduct), *cert. denied*, 519 U.S. 1046 (1996); *United States v. Morsley*, 64 F.3d 907, 911 (4th Cir. 1995) (identity evidence—uncharged misconduct evidence one year after charged misconduct), *cert. denied*, 516 U.S. 1065 (1996); *United States v. Yo*ung, 906 F.2d 615, 620 (11th Cir. 1990); *United States v. Bridwell*, 583 F.2d 1135, 1140 (10th Cir. 1978) (motive, intent, knowledge and plan evidence—uncharged misconduct one year after charged misconduct).

nature of the evidence was diminished by the fact the same conduct was already before the court members . . . ." *United States v. Acton*, 38 M.J. 330, 333 (C.M.A. 1993) (affirming admission of evidence that the accused showered with his children and showed them incestual child pornography in a proximate time period prior to the charged acts of sexually molesting his biological daughter). The term "unfair prejudice" for purposes of the Mil. R. Evid. 403 balancing test "address[es] prejudice to the integrity of the trial process, not prejudice to a particular party or witness." *United States v. Collier*, 67 M.J. 347, 354 (C.A.A.F. 2009). "'Unfair prejudice' within [its context] means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (internal quotation marks omitted) (citing Fed. R. Evid. 403 Advisory Committee's Notes).

In the event of non-constitutional error in admitting Mil. R. Evid. 404(b) evidence we evaluate for harmless error. Whether an error is harmless is a question of law we review de novo. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). "For non-constitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *Id.* (quoting *McCollum*, 58 M.J. at 342). "We evaluate the harmlessness of an evidentiary ruling by weighing: '(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'" *Id.* at 89 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

### 3. Analysis

Appellant claims that the military judge erred in ruling that the 6 February 2022 threatening incident between Appellant and MGW was admissible under Mil. R. Evid. 404(b) because: (1) common plan or scheme evidence should not include subsequent acts after the charged misconduct; (2) the 6 February 2022 incident did not make a fact of consequence more or less likely because the events were too dissimilar; and (3) the military judge's Mil. R. Evid. 403 balancing was brief and omitted any mention of possible prejudice. For the reasons set forth below we disagree with each assertion, and instead conclude the military judge did not abuse his discretion in admitting the evidence. Applying the abuse of discretion standard, we conclude the military judge's findings of facts were supported by the record, his conclusions of law utilized correct legal principles (including prominent reliance upon *Hyppolite*), and his application of the facts to the law was not arbitrary, fanciful, or clearly unreasonable. *See Hyppolite*, 79 M.J. at 166. Here the military judge correctly applied the *Reynolds* factors, as well as the CAAF's more recent application of those factors to "common plan or scheme" evidence particularly in *United States v. Hyppolite*, because: (1) a reasonable finder of fact could have concluded the 6 February

2022 incident took place; (2) that subsequent acts evidence can qualify for use under Mil. R. Evid. 404(b), and the evidence here was offered for a non-propensity purpose (*i.e.* common plan or scheme) and it made a fact of consequence more likely (*i.e.* whether Appellant's threatening language was "wrongful" under the circumstances); and (3) the probative value of that evidence was not substantially outweighed by any danger of unfair prejudice to the trier of fact's view of the evidence given the military judge's specific disclaimer that the evidence would not be considered for any propensity purpose. Accordingly we conclude the military judge did not abuse his discretion in admitting the 6 February 2022 evidence for a limited non-propensity purpose. We turn now to address why Appellant's arguments to the contrary fail.

First, we do not agree with Appellant's assertion that subsequent acts are impermissible under Mil. R. Evid. 404(b).[15] Nor do we agree that using such evidence is the functional equivalent of using propensity evidence simply because it is using later actions to prove a prior plan. Both the CAAF and seven of twelve federal circuit courts have affirmed the admissibility of subsequent acts as Mil. R. Evid./Fed. R. Evid. 404(b) evidence.[16] Appellant suggests that the CAAF's acknowledgement of the permissibility of subsequent acts evidenced in *Young* is essentially dicta because the CAAF ultimately resolved the case on a narrower ground—that the evidence was admissible "to show the subject matter and context of a conversation in which appellant admitted the charged conspiracy." 55 M.J. at 196–97 (citations omitted). While Appellant is correct that the CAAF decided *Young* on narrow grounds, we note that Appellant's interpretation of the precedential value of *Young* is at odds with the CAAF's own interpretation on this point. First, the CAAF's discussion of the permissible use of subsequent-acts Mil. R. Evid. 404(b) evidence was not a casual observation or a mere perfunctory aside, but rather involved the court surveying the federal circuit court caselaw and affirming that their analysis accorded with the CAAF's. *See id.* at 196 (reciting federal circuit court cases). Second, the CAAF later expressly relied upon and cited to *Young* in *United States v. James* for the precise proposition that there are no temporal restrictions that categorically exclude retrospective Mil. R. Evid. 404(b)

---

[15] Appellant cites *United States v. Munoz*, 32 M.J. 359, 360 (C.M.A. 1991) for the mistaken proposition that "evidence of a common scheme or plan should not be applied via Mil. R. Evid. 404(b) retrospectively." We note *Munoz* did not rule upon that issue, and instead ruled in a child sex abuse case that the appellant's uncharged misconduct upon another daughter, approximately 15 years *earlier,* was admissible. *Id.* at 363–64.

[16] *See* cases at n.14, *supra.*

evidence.[17] *See United States v. James*, 63 M.J. 217, 222 (C.A.A.F. 2006). In sum, we decline Appellant's suggestion to accord *Young* less weight than our superior court has.

Second, we do not agree with Appellant's assertion that the military judge misapplied *Hyppolite*. Instead, we find the military judge reasonably found that the 19 September 2020 charged incident and 6 February 2022 uncharged incident were substantially similar in terms of their surrounding circumstances so as to qualify as a "common plan or scheme" within the meaning of the governing case law as recited in *Hyppolite*. 79 M.J. at 165–66 (citing *Johnson*, 49 M.J. at 474–75; *Munoz*, 32 M.J. at 360–63; and *Reynolds*, 29 M.J. at 109). In relying upon *United States v. Morrison*, 52 M.J. 117, 122 (C.A.A.F. 1999), for the proposition that common plan or scheme evidence must be "almost identical" to the charged misconduct to qualify for admission under Mil. R. Evid. 404(b), Appellant misinterprets the CAAF's much more recent holding in *Hyppolite*. As discussed *supra*, the majority opinion in *Hyppolite* did not utilize the "almost identical" standard previously endorsed by the court in *Morrison*, and indeed, did not cite to *Morrison* at all. Only the dissent cited approvingly to *Morrison*. *See Hyppolite*, 79 M.J. at 167 (Ohlson, C.J., dissenting).

We decline Appellant's implied invitation to return to a method of analyzing common plan or scheme evidence utilizing the "almost identical" standard for admission. Instead, we adhere to the majority opinion in *Hyppolite*. In the case below, the military judge, applying *Hyppolite*, compared the charged incident of 19 September 2020 and uncharged incident of 6 February 2022 and concluded they were "substantially similar" in terms of: (1) the catalyst for each argument (concerns or frustrations dealing with parenting and child care); (2) Appellant's willful aggressive behavior, including death threats, in the presence of the couple's infant child (causing fear in MGW that the child would be harmed during each incident); (3) Appellant's attempts to keep MGW from leaving the site of the argument; and (4) after his intimidation tactics failed, Appellant's pre-emptive calls to 911 to foment a false narrative to undermine any subsequent report to law enforcement by MGW.

While Appellant's brief asserts that no fact of consequence was made more or less likely by virtue of the 6 February 2022 incident, we conclude that the military judge did not abuse his discretion in discerning that the fact of

---

[17] While the *James* case dealt with the admissibility of Mil. R. Evid. 413 evidence, the CAAF utilized *Young* for the proposition that retrospective evidence is admissible for both propensity and non-propensity purposes. *See James*, 63 M.J. at 222 ("We now continue down that road and conclude that the 'one or more offenses' language of [Mil. R. Evid.] 413 and [Mil. R. Evid.] 414 is no more temporally restrictive than the 'other crimes' language of [Mil. R. Evid.] 404(b).").

consequence was whether Appellant's communication of his threat was "wrongful." The existence of a common plan or scheme by Appellant to intimidate MGW from reporting his threatening behavior makes it more likely that his communication was "wrongful" because it indicates his communications were not in jest or idle banter—rather, they were serious attempts to intimidate her.[18]

In the end, the military judge's ruling essentially combined two permissible forms of Mil. R. Evid. 404(b) evidence: "controlling and manipulative behavior"[19] and "common plan or scheme." Combined, those theories make a fact of consequence more likely in this case, namely, how Appellant's common plan or scheme to use threats against MGW to dissuade her from reporting his misconduct to law enforcement bears upon whether Appellant's charged communications to MGW were "wrongful." As part of their burden of proof on the communicating a threat offense, the Government had to demonstrate that Appellant either intended to convey a threat, or operated with the knowledge that the target of his threat would interpret Appellant's threatening language as sincere. Any common plan or scheme formed by Appellant for the purpose of manipulating MGW into silence by virtue of threats and histrionics is relevant to proving or disproving that Appellant's charged communications were "in jest" or for some other "innocent" or "legitimate purpose." *See Rapert*, 75 M.J. at 169.

---

[18] We find this reasoning was at least implicit in the military judge's written ruling on this subject—even if communicated in slightly different verbiage. As the military judge noted in his ruling:

> [I]n both the incident underlying the charged offenses and the uncharged incident addressed here, the accused is alleged to have engaged in certain acts to frustrate MGW's ability or willingness to report these allegations by taking actual steps to prevent her from reporting and to increase his control over her so as to deter her from making a report.

Nonetheless, even if the military judge did not reach this conclusion explicitly, we do. Cognizant that we may affirm a military judge's ruling when the military judge reaches "the correct result, albeit for the wrong reason," *United States v. Bess*, 80 M.J. 1, 12 (C.A.A.F. 2020) (quoting *United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2003)), we affirm on the basis for admission of the evidence as cited in our opinion.

[19] *See United States v. Moore*, 78 M.J. 868 (A.F. Ct. Crim. App. 2019); *United States v. Lull,* ACM 39555, 2020 CCA LEXIS 301 (A.F. Ct. Crim. App. 2 Sep. 2020) (unpub. op.). The military judge's ruling correctly cited each of these cases for the proposition that an accused's controlling or manipulative behavior over a crime victim may, in appropriate cases, be used for a non-propensity purpose.

Turning to the military judge's Mil. R. Evid. 403 balancing of the common plan/scheme evidence, the military judge specifically distinguished this from a propensity use, reasoning: "The [G]overnment seeks to draw parallels between the specifics of [Appellant's] behavior when he is frustrated with MGW as opposed to establishing that the accused has a general tendency to engage in domestic violence." The military judge also explicitly assured the parties he would draw no propensity inference from this evidence, stating "[a]s the finder of fact in this military judge alone case, the court will consider this [Mil. R. Evid.] 404(b) evidence only for the limited purpose that it may establish a common scheme or plan and not for reasons prohibited by [Mil. R. Evid.] 404(a) or for propensity purposes." We presume absent evidence to the contrary that "a military judge knows the rules of evidence and considers testimony only for permissible purposes." *United States v. Hill*, 62 M.J. 271, 276 (C.A.A.F. 2006) (citation omitted); *see also United States v. Davis*, 44 M.J. 13, 17 (C.A.A.F. 1996) ("When a judge indicates he will not consider inadmissible evidence, . . . we presume that he will do as he says." (Omission in original).).

While Appellant asserts that the military judge's Mil. R. Evid. 403 balancing was essentially *pro forma* and conclusory, even if that were so, that simply means we accord his ruling on that issue less deference on appeal—not that his ultimate ruling was incorrect. *See Barnett*, 63 M.J. at 396. Indeed, we are entitled to affirm a military judge who reaches a correct result even if he did so for incorrect reasons. *See United States v. Bess*, 80 M.J. 1, 12 (C.A.A.F. 2020) (quoting *United States v. Robinson*, 58 M.J. 429, 433 (C.A.A.F. 2003)) (affirming a military judge's denial of a motion to suppress evidence where "the military judge reached the correct result, albeit for the wrong reason").

Regardless of the depth of the military judge's Mil R. Evid. 403 balancing analysis, the military judge's ruling expressly disclaimed any propensity use for the Mil. R. Evid. 404(b) evidence at issue. Absent evidence to the contrary, we conclude the military judge followed his own ruling. *Hill*, 62 M.J. at 276. Having reviewed the entire record ourselves, we are convinced that the probative value of the challenged evidence is not substantially outweighed by the danger of unfair prejudice because, similar to our reasoning in *United States v. Moore*, "[a]ppellant's controlling behavior demonstrated that he had the motive and intent to repress, instead of respect, her personal autonomy." 78 M.J. 868, 875 (A.F. Ct. Crim. App. 2019). Such a motive to repress would tend to render Appellant's communications wrongful by demonstrating that those threats were not being issued in jest or for any "legitimate purpose." *See Rapert*, 75 M.J. at 169 (noting that as to the wrongfulness element, the Government bears the burden of proof to prove that "the speaker intended the statements as something other than a joke or idle banter, or intended the statements to serve something other than an innocent or legitimate purpose").

In fairness to Appellant's claim in his brief that there was "no discussion of what the risk of prejudice would be [in the military judge's ruling]," we independently considered a point only impliedly raised in Appellant's brief, to wit: whether the alleged February 2022 domestic violence incident was unfairly prejudicial because it involved similar allegations of serious misconduct (involving, *inter alia*, Appellant's alleged threats to "put a bullet" in MGW's back and her consequently feeling compelled to flee the marital residence and stay at a hotel). Consistent with the CAAF's precedent, we conclude the serious nature of the uncharged misconduct is not unduly prejudicial to the trier of fact because even flagrant uncharged misconduct is less likely to inflame the prejudices of the trier of fact when the charged misconduct itself is of a similar severity. *See Acton*, 38 M.J. at 333. Both the charged (September 2020) and uncharged (February 2022) threat incidents involved death threats. The gravamen of the uncharged threat was not significantly greater than the charged threat. Particularly in a judge-alone context, we are unconvinced the probative value of the evidence was substantially outweighed by the dangers of unfair prejudice. Moreover, we note the primary danger to be avoided in Mil. R. Evid. 404(b) evidence is that the trier of fact may draw an impermissible propensity inference from such evidence. In a judge-alone case, there is much lower probability of impermissible use. *See Moore*, 78 M.J. at 875. We find this to be particularly so given the military judge's explicit ruling that he would not consider the evidence for a propensity purpose, and his reasonable explanation for differentiating the two in regard to this evidence. Under the circumstances, we find no evidence in the record of trial that the military judge considered the Mil. R. Evid. 404(b) evidence for anything other than what he told the parties he would in his ruling. We further conclude the military judge's findings of fact were not clearly erroneous, he relied upon applicable principles of law in evaluating the evidence, and his final application of law to facts reached the right conclusion.

## C. Victim Unsworn Statement

Appellant asserts that the military judge abused his discretion in overruling a defense objection that portions of MGW's victim unsworn statement impermissibly commented on Appellant's constitutional right to plead not guilty and to not incriminate himself. In essence, Appellant argues that MGW's victim unsworn statement contained improper "recalcitrance" evidence.[20] Over defense objection, the military judge permitted the following passages to remain in the statement: (1) "[*Appellant*] *has never taken responsibility* for any

---

[20] Recalcitrance evidence generally refers to "an accused's recalcitrance in refusing to admit his guilt after findings." *See United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991) (citing *United States v. Warren*, 13 M.J. 278 (C.M.A. 1982)).

of the horrible things he has done;" and (2) "[*Appellant*] *has shown no remorse* and he thinks it's ok to treat people the way he treated me in front of my son." (Emphasis added). Based upon the limited purposes of admissibility articulated by the military judge in overruling Appellant's constitutional objections at trial, we find no error.

### 1. Additional Background

After trial defense counsel lodged their objections to MGW's victim unsworn statement as noted above, the military judge asked if trial defense counsel had any *other* objections prior to the judge's ruling. Trial defense counsel responded, "No, Your Honor." The military judge then proceeded to overrule the defense objection before him. The military judge provided the following reasoning on the record:

> I'm overruling defense counsel's objection. I find that the paragraph in question, specifically the first two lines of that paragraph as objected to by defense counsel, highlights information that could be taken as victim impact in that [MGW] is expressing the accused's reaction to her -- this incident between them that underlies the specification of Charge I has caused additional impacts on her. *That's how I am interpreting those two statements and not as a comment on his constitutional right to plead not guilty to that charge and its specification.* This court certainly will not hold that against [Appellant] in my sentencing decision.

(Emphasis added).

Following the admission of the victim unsworn statement, trial defense counsel presented their sentencing case which included a written and oral unsworn statement by Appellant. Appellant did not offer an apology to MGW in his written unsworn statement, but did in his brief oral statement, stating: "First, I want to apologize to [MGW] for her time and having to endure this pain."

Trial counsel's sentencing argument made only passing reference to the "remorse" and "responsibility" commentary in MGW's victim unsworn statement. In two brief sentences, trial counsel referred to a lack of remorse demonstrated not by Appellant's silence nor his not-guilty plea, but rather to his out-of-court interactions: "And after attempting to fabricate that false narrative, he painted [MGW] as the aggressor. *He showed no remorse.*" (Emphasis added). After raising an initial objection that this argument might implicate Appellant's constitutional rights, trial defense counsel later withdrew that objection after the military judge initially deferred ruling upon the objection to permit trial counsel to place the argument in context.

**2. Law**

For alleged errors preserved by a defense objection at trial, we review a military judge's admission of victim impact statements in presentencing for an abuse of discretion. *See United States v. Edwards,* 82 M.J. 239, 243 (C.A.A.F. 2022) (citing *United States v. Hamilton*, 78 M.J. 335, 340 (C.A.A.F. 2019) (citation omitted)). "A military judge abuses his discretion when his legal findings are erroneous, or when he makes a clearly erroneous finding of fact." *Id.* (citations omitted). For preserved objections, if an error occurs in the admission of sentencing matters, the test for prejudice is "whether the error substantially influenced the adjudged sentence." *Id.* at 246 (citations omitted).

Article 6b(a)(4)(B), UCMJ, grants victims of offenses under the UCMJ the right to be reasonably heard at a sentencing hearing related to the offense. 10 U.S.C. § 806b(a)(4)(B). A victim afforded this right is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense under [the UCMJ]." Article 6b(b), UCMJ, 10 U.S.C. § 806b(b).

Under R.C.M. 1001(c), victim unsworn statements "may only include victim impact and matters in mitigation." R.C.M. 1001(c)(3). Victim impact includes "any financial, social, psychological, or medical impact on the crime victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001(c)(2)(B). "Although the unsworn victim statement is not subject to the Military Rules of Evidence, this does not mean that the military judge is powerless to restrict its contents." *United States v. Tyler*, 81 M.J. 108, 111 (C.A.A.F. 2021). "[T]he military judge has an obligation to ensure the content of a victim's unsworn statement comports with the parameters of victim impact or mitigation as defined by [R.C.M. 1001(c)]." *Id.* (citation omitted)

Caselaw interpreting "victim impact" within the R.C.M. 1001(b) aggravation evidence context is an appropriate framework to construe the scope of R.C.M. 1001(c) "victim impact" given the similarity of definitions. *See United States v. Goldsmith*, No. ACM 40148, 2023 CCA LEXIS 8, at \*20–21 (A.F. Ct. Crim. App. 11 Jan. 2023) (unpub. op.). In that regard, the CAAF has previously held that the psychological and medical effect of the investigation and court-martial (stemming from the convicted misconduct) on the victim is admissible victim impact evidence. *See United States v. Gomez*, 76 M.J. 76, 81 (C.A.A.F. 2017); *United States v. Stephens*, 67 M.J. 233, 235–36 (C.A.A.F. 2009).

Recalcitrance evidence is generally only admissible at sentencing for two purposes: (1) as "victim impact" evidence when an appellant's recalcitrance imposes a distinct psychological impact on the crime victim, *see United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991) ("Just as steadfastness in denying guilt might reflect on the accused's rehabilitative potential, it might also have

special impact on the victim. . . . [W]here a proper foundation is laid, such testimony is . . . relevant evidence of the impact on the victim of the accused's crime."); and (2) as rebuttal of rehabilitative potential of an accused, *see United States v. Edwards*, 35 M.J. 351, 355 (C.M.A. 1992) (citations omitted).

Recalcitrance evidence may not stray into commentary by a witness on an accused's exercise of their constitutional rights. Unauthorized commentary by witnesses or counsel attempting to weaponize an accused's right to remain silent as a matter in "aggravation" at sentencing constitutes constitutional error. *See Stephens*, 67 M.J. at 235 (citations omitted); *United States v. Paxton*, 64 M.J. 484, 487 (C.A.A.F. 2007) (holding "[a] sentencing argument by trial counsel which comments upon an accused's exercise of his or her constitutionally protected rights is 'beyond the bounds of fair comment'") (citation omitted)). In the context of a constitutional error, the burden is on the Government to establish that the comments were harmless beyond a reasonable doubt. *United States v. Tovarchavez*, 78 M.J. 458, 462–63 (C.A.A.F. 2017) (citations omitted).

Finally, as the sentencing authority, a military judge is presumed to know the law and apply it correctly, absent clear evidence to the contrary. *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009) (citations omitted). We also "presume[ ] a military judge follows [his] own rulings." *Id.* (citations omitted). He is also presumed to "distinguish between proper and improper arguments." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citation omitted).

### 3. Analysis

Here the military judge overruled the defense objections to the unsworn statement with two key caveats: that he would consider the evidence (1) only for the limited purpose of the "emotional impact" on MGW and (2) expressly *not* as any commentary on Appellant's constitutional rights. The military judge did not consider those passages as improper commentary on Appellant's exercise of his constitutional rights. We find no abuse of discretion in the military judge's ruling.

First, having reviewed the record, to include the full text of MGW's written victim unsworn statement, we find adequate factual support for the miliary judge's finding that MGW's words, in context, were in reference to the psychological impact she felt as a consequence of Appellant never sincerely apologizing to her for the charged misconduct.[21] Even assuming *arguendo* that

---

[21] As part of his argument that the military judge abused his discretion in overruling trial defense counsel's constitutional objection to portions of MGW's unsworn statement, Appellant also suggests error in the military judge's purported failure to recognize that MGW's statement referred to uncharged misconduct. However, Appellant

passages from MGW's victim unsworn statement calling Appellant to task for never apologizing or "taking responsibility for his actions" could conceivably be construed as commentary on Appellant's right to remain silent, there was no error here because the military judge did not consider them *for that purpose.* Instead, the military judge made an express disclaimer that he was considering those words as an expression of the emotional impact on the victim. That is a permissible form of victim impact evidence. *See Stephens*, 67 M.J. at 235–36 (distinguishing permissible victim impact from impermissible commentary on constitutional rights, explaining error in prior cases lay in "the government, at trial, explicitly comment[ing] on the fact that the appellant's invocation of his constitutional right to a trial forced the victim to endure the rigors of cross-examination and relive the experience of being attacked" (citations omitted)); *Holt*, 33 M.J. at 408. Furthermore, applying the presumption that the military judge follows his own rulings, *Sanders*, 67 M.J. at 346, we conclude beyond a reasonable doubt that the military judge considered the evidence for the limited purpose he articulated on the record at trial. Thus, any error in admitting this evidence was not compounded by considering them for an improper purpose *(i.e.*, as commentary on Appellant's exercise of his constitutional right to remain silent and plead not guilty).

While we find no error here, even assuming *arguendo* there was, we are convinced beyond a reasonable doubt that MGW's unsworn victim impact statement did not substantially impact the sentence adjudged, and therefore there was no prejudice arising from admission of the challenged portions of MGWs unsworn victim impact statement in this judge-alone trial. First, neither side referred *directly* to these brief passages in their sentencing arguments, further limiting any possibility the military judge would accord any undue weight to this evidence. Trial counsel referenced Appellant "show[ing] no remorse" in only two brief sentences of a sentencing argument spanning 77 lines in the record of trial. But crucially, when trial counsel did so, it was in reference to actual admissible aggravation evidence in the case—namely, it was in the context of Appellant "show[ing] no remorse" in creating a "false narrative" in his statement to law enforcement by misconstruing the underlying events of the convicted misconduct. In fact, while trial defense counsel initially objected when these brief arguments emerged during trial counsel's sentencing

---

raised an identical argument in his fifth assignment of error: "WHETHER THE MILITARY JUDGE ERRED BY ALLOWING THE VICTIM'S UNSWORN STATEMENT TO ADDRESS MATTERS OUTSIDE THE SCOPE OF PERMISSIBLE 'VICTIM IMPACT.'" As Appellant himself concedes in his brief in dealing with his fifth assignment of error, he waived that issue by affirmatively declining to raise any other bases for objection to MGW's victim unsworn statement at trial.

argument, trial defense counsel later *withdrew* that objection, as trial counsel's argument made clear it was *not* referring to Appellant's exercise of his constitutional rights.

Second and finally, the relative severity of Appellant's misconduct—making an implicit death threat against his wife—compared with the military judge's decision to impose only one-fourth of the trial counsel's recommended sentence—are some indicia that the military judge did not ascribe any significant weight to the these passages from MGW's unsworn victim impact statement. In a case where trial counsel requested one year of confinement and a bad-conduct discharge, the military judge sentenced Appellant to three months' confinement, a bad-conduct discharge, and a reprimand. Under the circumstances, we are convinced that any erroneously admitted portions of MGW's unsworn victim impact statement had no measurable impact on the sentence, and thus, that their admission was harmless beyond a reasonable doubt.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and approved sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court